

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-13-00020-CV

GLASSELL PRODUCING COMPANY, INC., ET AL., Appellants

V.

JARED RESOURCES, LTD., ET AL., Appellees

On Appeal from the County Court at Law
Panola County, Texas
Trial Court No. 2012-213

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

## O P I N I O N

### I. Introduction

We withdraw our opinion of November 21, 2013, and substitute the following opinion in its place.

This appeal, at its core, involves a dispute between a brother and a sister over the proceeds generated from property interests left to them by their father. Curry Glassell sued her brother, Alfred C. Glassell, III, among others, claiming fraud, conversion, breach of fiduciary duty, and numerous other causes of action.[1] Alfred, III, and the other defendants filed a motion to compel arbitration, invoking an arbitration clause contained in a letter agreement Curry had signed. The trial court denied the motion to compel arbitration. This is an interlocutory appeal from that denial. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 51.014, 51.016 (West Supp. 2013), § 171.098 (West 2011).

### II. Factual Background

Alfred Glassell, Jr., owned and operated oil and gas interests in Panola County, Texas, for many years. In 2007, Glassell Producing Company, Inc. (GPC), succeeded Alfred, Jr., as the operator of his oil and gas interests, and, at the same time, his son, Alfred, III, became the president and a director of GPC.

In 2008, Alfred, III, in his role as GPC's president, contacted Curry by letter informing her that GPC had received an "'unsolicited offer'" from Chesapeake Enterprises to purchase

---

[1]The petition was originally filed by Jared Resources, Ltd., an entity to which Curry had assigned her interests at issue in this case. Curry later joined the suit individually to assert claims against Cabo Blanco Company (a corporation the family formed to minimize tax liability) and its directors.

2

deep rights in the Wiener Unit, a unit also located in Panola County.[2] Curry signed a letter agreement to facilitate the $100 million sale to Chesapeake. This agreement, which contained a binding arbitration clause, was also signed by GPC through its president. No other parties or individuals signed this letter agreement. The applicability of the binding arbitration clause contained in this letter agreement is the central issue in this appeal.

In connection with the potential sale to Chesapeake, the parties conducted a title search of the property comprising the Wiener Unit, which revealed that in 1982, Alfred, Jr., had assigned mineral rights in properties located in the Bird, Bounds, and Panola Units to his children, Alfred, III, and Glassell.[3]

As a direct result of the proposed sale to Chesapeake, on October 27, 2008, the sellers, including Curry, created overriding royalties out of the properties being sold to Chesapeake.[4] GPC hired tax advisors who proposed that a family corporation hold the overriding royalty interests to minimize tax liability. In keeping with this advice, Cabo Blanco was created to hold the seller's recently created overriding royalties. Alfred, III, Thad Dameris, and Pam Lindberg were the initial directors and continue to serve as directors of Cabo Blanco.

The Chesapeake sale was set to close in October 2008; however, the deal was delayed by Alfred, Jr.'s, death only days before the scheduled closing. Ultimately, the deal closed in October 2009 as a result of litigation between the Glassells and Chesapeake.

---

[2]Alfred, Jr., had assigned mineral rights in the Wiener Unit to Curry in 1974.

[3]These mineral rights were actually assigned to a trust for the benefit of Alfred, III, and Curry, but the trust expired, giving the children outright ownership of the mineral rights.

[4]The terms of the Chesapeake sale limited overriding royalties to twenty percent.

In 1996, Curry granted Alfred, III, a power of attorney giving him full authority to handle her real property transactions, commodity and option transactions, and energy powers. That power of attorney was in effect until 2009. Curry alleges that, during this time—1996 through 2009—Alfred, III, never informed her of any actions related to her property interests. On January 1, 2012, GPC announced, according to Curry, that it would cease marketing and operating Curry's leasehold interests. Curry also claims that Cabo Blanco refused to provide her with any stock certificates, refused to explain what share of the business she owned, and refused to provide her with formation papers, minutes of the board meetings, or an accounting.

Curry sued GPC, Cabo Blanco, and the three directors of Cabo Blanco, Alfred, III, Dameris, and Lindberg.[5] Curry's lawsuit seeks an accounting of (1) all her property interests, (2) past-due royalties owed her, and (3) her interest in Cabo Blanco. Curry's petition also raises claims of fraud, shareholder oppression, constructive fraud, breach of fiduciary duty, negligence, gross negligence, conversion, breach of contract, and unjust enrichment. Curry claims GPC's own accountants concede she is owed $1.4 million. She further alleges that GPC breached its duty as an operator and committed fraud in overcharging costs, misrepresenting her income, and converting her property. Curry claims that Alfred, III, owed her a fiduciary duty due to his special relationship of trust created by his superior knowledge of the oil and gas business, his familial relationship, and the power of attorney she granted to him. Curry also alleges that she relied upon misrepresentations that Cabo Blanco would be operated as a "normal company" and

---

[5] We will refer collectively to Cabo Blanco, Alfred, III, in his individual capacity and in his official capacity as an officer and director of Cabo Blanco, Dameris, and Lindberg as the Nonsignatories.

that Cabo Blanco owed her a fiduciary duty. Curry contends that Alfred, III, "manipulates" both GPC and Cabo Blanco as his alter ego and that, consequently, the corporate veils of both companies should be pierced.

The defendants below collectively filed a motion to compel arbitration of some, but not all, of Curry's claims.[6] The motion to compel sought arbitration of the following claims:

- Fraudulently misrepresenting that [the Defendants] would act reasonably, fairly, and prudently and in Curry's best interest in creating, operating, and conducting the affairs of Cabo Blanco;

- Fraudulently refusing to provide evidence of ownership of Cabo Blanco;

- Fraudulently representing the costs and expenses incurred in connection with the creation of Cabo Blanco;

- Fraudulently overcharging Curry's interests in Cabo Blanco and failing to pay Curry all monies due to her; and

- Failing to provide an accounting to substantiate costs assessed against Curry's interest in Cabo Blanco.

The motion to compel continues,

> Further, Curry alleges that Defendants Alfred III, Dameris, and Lindberg owe a duty to her, as directors of Cabo Blanco, and they have breached those duties by failing to disclose materials [sic] facts to her, and not acting in her best interests . . . .

> In sum, Curry has brought a [sic] fraud, fraud in the inducement, fraud by nondisclosure, constructive fraud, shareholder oppression, constructive trust,

---

[6]On appeal, the parties agree that certain claims "belong in court, not arbitration." These claims include the accounting claims as well as Curry's claims that as "a non-operating interest owner that she should be netting more from the wells than she is being paid." GPC also alleges Curry's claims "attributable to periods before Alfred Jr. died" have been transferred to the Harris County Probate Court, which has exclusive jurisdiction over the estate. The appellate record contains a copy of the motion to transfer but does not otherwise confirm this assertion.

breach of fiduciary duty, negligence, unjust enrichment, and breach of contract causes of action against Cabo Blanco, its directors, and GPC.

Appellants allege that all claims arising out of or relating to Cabo Blanco should be compelled to arbitration. The trial court denied the motion to compel.

Both GPC and Curry signed the letter agreement and are bound by it. Appellants raise two issues: (1) whether the scope of the arbitration clause includes all claims against GPC and (2) whether the claims against the Nonsignatories are subject to arbitration under the theories of equitable estoppel, alter ego, and agency.

On rehearing, the parties have reached an agreement clarifying the claims for which arbitration was sought to be compelled. GPC and Curry have agreed that the disputed claims against GPC and Alfred, III, in his capacity as an officer and director of GPC, sought to be submitted to arbitration are claims "that relate to the sale to Chesapeake, the creation of the overriding royalty interests, and the creation or operations of Cabo Blanco." GPC and Curry also agree:

> Claims specifically not compelled to arbitration that are raised against GPC and Alfred III, in his capacity as officer and director for GPC, include claims relating to the 1982 Assignment of interests to Curry Glassell, any failure to disclose that assignment, and any failure to pay revenue owing to Appellants as a result of those working interests. These include any interests in shallow rights retained by Appellants after the sale to Chesapeake.

The following opinion should be interpreted consistent with these agreements.

We conclude that Curry's claims relating to the sale to Chesapeake, the creation of the overriding royalty interests, and the creation of or operations of Cabo Blanco against GPC, a signatory to the letter agreement, and its agent Alfred, III, in his official capacity as an officer

6

and director of GPC, should be submitted to arbitration. Additionally, we find that Curry's claims against the Nonsignatories for the "overpayment of costs"[7] should be submitted to arbitration. Finally, we conclude that the remaining claims against the Nonsignatories are not subject to arbitration.

## III. Claims Against GPC

GPC argues in its first issue that Curry's claims relating to the sale to Chesapeake, the creation of the overriding royalty interests, and the creation of or operations of Cabo Blanco— even though sounding in tort—fall within the scope of the arbitration clause. GPC claims that the letter agreement established the overarching legal structure for Curry's participation in the Chesapeake deal and that, since Cabo Blanco formed an integral part of implementing the Chesapeake deal, the claims are within the scope of the letter agreement's arbitration clause. Curry responds that the letter agreement was only a cost-sharing arrangement and that the scope of the arbitration clause is limited to breach of contract claims concerning costs.

The burden to prove the existence of an arbitration agreement between the parties and that the claims are within the scope of that arbitration clause is on the party seeking to compel arbitration. *See, e.g.*, *In re Morgan Stanley & Co.*, 293 S.W.3d 182, 185 (Tex. 2009) (orig. proceeding); *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (orig. proceeding); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003). Once the party

---

[7]On rehearing, the parties reached an agreement concerning clarification of the term "overpayment of costs" in our original opinion. GPC and Curry have agreed that the term "overpayment of costs" should be defined as "overcharges or misrepresentations of the costs and expenses associated with the Chesapeake sale, the creation of overriding royalty interests, and/or the creation of Cabo Blanco." The following opinion should be interpreted consistent with this agreement.

seeking arbitration proves an agreement to arbitrate the claims, "a strong presumption favoring arbitration arises, and the burden shifts to the party opposing arbitration to raise an affirmative defense to the agreement's enforcement." *Ellis v. Schlimmer*, 337 S.W.3d 860, 862 (Tex. 2011) (per curiam). Curry asserted no defenses;[8] thus, the sole issue before this Court is the scope of the arbitration clause, or, stated more precisely, whether Curry's claims are within the scope of the letter agreement's arbitration clause.[9]

Determining whether a claim falls within the scope of an arbitration agreement involves the trial court's legal interpretation of the agreement, and we review such interpretations de novo. *BossCorp, Inc. v. Donegal, Inc.*, 370 S.W.3d 68, 75–76 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Dell, Inc. v. Muniz*, 163 S.W.3d 177, 180 (Tex. App.—San Antonio 2005, orig. proceeding); *see Belk*, 349 S.W.3d at 879 ("De novo review is appropriate when the legal interpretation of the arbitration clause, and no fact issue, is before the court.").

### A. The Intent of the Parties Is Determined from the Plain Language

GPC and Curry agree that the scope of the arbitration clause is determined by the intent of the parties. Both sides, though, attempted to prove intent with parol evidence. Unless the

---

[8]Only a claim of fraudulent inducement specific to the arbitration clause is a defense to arbitration—a defense that the entire contract was fraudulently induced is subject to arbitration. *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 756 (Tex. 2001) (orig. proceeding); *Fogal v. Stature Constr., Inc.*, 294 S.W.3d 708, 719 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *Holk v. Biard*, 920 S.W.2d 803, 807 (Tex. App.—Texarkana 1996, orig. proceeding). All of Curry's fraudulent inducement complaints claim the entire contract was fraudulently induced.

[9]The parties' agreement to arbitrate a matter can be a fact question, in which case we would afford deference to the fact-finder's determination. *See Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 269 (Tex. 1992) (orig. proceeding) (if material facts necessary to determine issue are controverted by opposing affidavit or otherwise admissible evidence, trial court must conduct evidentiary hearing to determine disputed material facts); *Tex. La Fiesta Auto Sales, LLC v. Belk*, 349 S.W.3d 872, 879 (Tex. App.—Houston [14th Dist.] 2011, no pet.). This case, though, presents no fact questions. None of the facts were controverted, and no evidentiary hearing was held. The hearing in this case consisted entirely of legal arguments by counsel.

contract is ambiguous, the intent of the parties is determined from the plain language of the contract—not parol evidence.

The scope of an arbitration clause is a gateway matter to be determined by the court rather than the arbitrator. *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130 (Tex. 2005) (orig. proceeding). Under both the Federal Arbitration Act (FAA) and the Texas General Arbitration Act (TAA), arbitration provisions are evaluated under state contract interpretation law. *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 676 (Tex. 2006) (orig. proceeding); *Kellogg Brown & Root, Inc.*, 166 S.W.3d at 738 (Tex. 2005); *In re Green Tree Servicing LLC*, 275 S.W.3d 592, 599 (Tex. App.—Texarkana 2008, orig. proceeding). The Texas Supreme Court has observed, "Our primary concern when we construe a written contract is to ascertain the parties' true intent as expressed in the contract." *Epps v. Fowler*, 351 S.W.3d 862, 865 (Tex. 2011). The intent, though, is determined solely by the plain language of the contract. *DeWitt Cnty. Elec. Coop. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999).

An arbitration provision "is unambiguous if it can be given a definite or certain legal meaning." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). If the plain language of a contract is unambiguous, the contract will be enforced as written and extrinsic, or parol, evidence will not be admissible to create an ambiguity or to give the contract a meaning different from the plain language. *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011); *Sacks v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (per curiam); *Webster*, 128 S.W.3d at 229; *see Green Tree Servicing LLC*, 275 S.W.3d at 599.

If the contract can be given a definite legal meaning, then it is not ambiguous, and the court will construe it as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *Guerrero v. Guerra*, 165 S.W.3d 778, 782 (Tex. App.—San Antonio 2005, no pet.). If, however, a contract is capable of more than one reasonable interpretation, it is ambiguous. *Guerrero*, 165 S.W.3d at 782. Whether a contract is ambiguous is a question of law that we review de novo. *Shanks v. Treadway*, 110 S.W.3d 444, 447 (Tex. 2003).

Neither side argues that the letter agreement is ambiguous. The agreement provides, in relevant part,

> Any controversy or claim, whether based in contract, tort or otherwise, arising in any way out of, relating to or in connection with this letter agreement (a "Dispute") shall be finally settled by arbitration . . . .

This arbitration clause is unambiguous, and the intent of the parties must be determined from the plain language of the contract. Therefore, we will not consider the affidavits of Curry or Alfred, III, in determining the intent of the parties but will confine our review to the plain language of the contract.

**B.      The Scope of the Arbitration Clause is Limited to Claims that "Relate to" the Letter Agreement**

Curry claims the scope of the arbitration clause should be limited to explicit contract claims. The Texas Supreme Court has rejected "a narrow interpretation that would apply only to explicit contract claims." *Weekley Homes, L.P.*, 180 S.W.3d at 131. "When determining whether claims fall within the scope of the arbitration agreement, we look to the factual allegations, not the legal claims." *Rachal v. Reitz*, 403 S.W.3d 840, 850 (Tex. 2013); *FirstMerit*

10

*Bank, N.A.*, 52 S.W.3d at 754; *see Prudential Secs., Inc. v. Marshall*, 909 S.W.2d 896, 900 (Tex. 1995) (orig. proceeding) (per curiam). The determination is made based on the substance of the claim, not artful pleading. *Weekley Homes, L.P.*, 180 S.W.3d at 131–32.

The scope of an arbitration clause is determined based on the "complaint's factual allegations rather than the legal causes of action asserted." *FirstMerit Bank, N.A.*, 52 S.W.3d at 754; *see Rachal*, 403 S.W.3d at 850. "[C]ourts should resolve any doubts as to the agreement's scope, waiver, and other issues unrelated to its validity in favor of arbitration." *Ellis*, 337 S.W.3d at 863. Claims must be submitted to arbitration if "liability arises solely from the contract or must be determined by reference to it." *Weekley Homes, L.P.*, 180 S.W.3d at 132. A claim is not subject to arbitration only if the facts alleged in support of the claim are completely independent of the contract and the claim could be maintained without reference to the contract. *Cotton Commercial USA, Inc. v. Clear Creek Indep. Sch. Dist.*, 387 S.W.3d 99, 108 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Pennzoil Co. v. Arnold Oil Co.*, 30 S.W.3d 494, 498 (Tex. App.—San Antonio 2000, orig. proceeding); *accord Kellogg Brown & Root, Inc.*, 166 S.W.3d at 739 (a "direct benefits estoppel" analysis).

Curry argues that the claims asserted fall outside of the agreement to arbitrate. To support that proposition Curry cites *Osornia v. AmeriMex Motor & Controls, Inc.*, 367 S.W.3d 707, 712–14 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("[S]trong policy in favor of arbitration cannot serve to stretch a contractual clause beyond the scope intended by the parties or to allow modification of the unambiguous meaning of the arbitration clause."). *Osornia*, though, is factually distinguishable from this case. The arbitration clause in *Osornia* was narrow

11

in that it only applied to "'any and all claims arising out of this Agreement.'" *Id.* at 709. Noting that most arbitration clauses contain language that is more broad, such as "relating to" or "connected with," the court held that claims accruing before the effective date of the settlement agreement containing the arbitration clause did not arise out of the settlement agreement and were not within the scope of the arbitration clause. *Id.* at 712–13. The court distinguished prior caselaw, including the cases cited below, as circumstances where the parties signed broad arbitration clauses agreeing "to arbitrate all claims arising out of or relating to a contract or in which the parties agree to arbitrate all disputes that may arise among them." *Id.* at 714. This case is factually distinguishable from *Osornia* because the arbitration clause in this case includes claims "relating to or in connection with" in addition to those "aris[ing] from" the letter agreement. Arbitration clauses in which the scope is defined using "relating to" and similar wide-reaching phrases are interpreted broadly. *In re Guggenheim Corp. Funding, LLC*, 380 S.W.3d 879, 887 (Tex. App.—Houston [14th Dist.] 2012, orig. proceeding) (per curiam).

When a contract includes a broad arbitration clause, such as the one in this case, an allegation is within the scope of the arbitration provision if the allegation is covered by, has a significant relationship to, is inextricably enmeshed with, or is factually intertwined with the contract that contains the arbitration agreement.[10]

---

[10]*See, e.g.*, *Gray Wireline Serv., Inc. v. Cavanna*, 374 S.W.3d 464, 469 (Tex. App.—Waco 2011, no pet.); *Ascendant Anesthesia PLLC v. Abazi*, 348 S.W.3d 454, 462 (Tex. App.—Dallas 2011, no pet.); *In re Helix Energy Solutions Grp., Inc.*, 303 S.W.3d 386, 397 (Tex. App.—Houston [14th Dist.] 2010, orig. proceeding); *Tex. Petrochemicals LP v. ISP Water Mgmt. Servs. LLC*, 301 S.W.3d 879, 885 (Tex. App.—Beaumont 2009, no pet.); *In re Bath Junkie Franchise, Inc.*, 246 S.W.3d 356, 366 (Tex. App.—Beaumont 2008, orig. proceeding) (per curiam); *Kirby Highland Lakes Surgery Ctr., L.L.P. v. Kirby*, 183 S.W.3d 891, 898 (Tex. App.—Austin 2006, orig. proceeding); *In re*

Curry argues that her claims against GPC are independent of the letter agreement, citing *AutoNation USA Corp. v. Leroy (In re AutoNation USA)*, 105 S.W.3d 190, 195 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding). While *AutoNation* does recognize the possibility that a claim can be independent of a contract and, therefore, beyond the scope of that contract's arbitration clause, the Fourteenth District Court found in *AutoNation* that Leroy's claim that a contract fee which exceeded the maximum fee permitted by the Finance Code was subject to arbitration. *Id.* at 197. The court held that the claim must be decided by referencing the contract and, therefore, "touched matters" covered by the contract. *Id.* We find very little support for Curry's position in *AutoNation*.

Curry's next argument is that the letter agreement is actually a "cost sharing agreement . . . directed solely to cost allocation associated with the negotiation and sale of properties to Chesapeake." The plain language of the agreement, though, contradicts this argument. In the letter agreement, Curry and GPC agreed that GPC would negotiate a sale with Chesapeake and that Curry would bear her proportionate share of all costs. While cost allocation is certainly one component of the letter agreement, the agreement's scope unquestionably extends beyond just costs. The plain language of the agreement states that in exchange for Curry's agreement to pay costs and maintain confidentiality, GPC will negotiate the terms of the sale to Chesapeake. The agreement further provides Curry with numerous rights, including (1) the right to "periodic verbal and/or written reports . . . regarding the status of the negotiation

---

*Prudential Secs., Inc*., 159 S.W.3d 279, 283 (Tex. App.—Houston [14th Dist.] 2005, orig. proceeding); *Pennzoil Co. v. Arnold Oil Co*., 30 S.W.3d 494, 498 (Tex. App.—San Antonio 2000, orig. proceeding).

13

and consummation of any sale[,]" (2) the right to make "reasonable requests for explanations of, or additional documentation in support of, any such reports or other data or information in GPC's possession or under its control that may be relevant to the sale of [her] interest in the Properties[,]" and (3) the right to use the negotiated sale contract. The letter agreement was more than merely a cost-sharing agreement.

Curry's remaining argument is that her claims do not arise out of the sale because Cabo Blanco was formed to manage assets withheld from the sale—not assets sold.[11] Curry argues that the letter agreement was entered into prior to the creation of Cabo Blanco and that the creation of Cabo Blanco was immaterial to the Chesapeake deal. Curry further emphasizes that Cabo Blanco was referenced by neither the letter agreement nor the Chesapeake sale contract and contends that the purpose of Cabo Blanco was not to facilitate the sale.

We agree with GPC that Cabo Blanco was created to facilitate the sale and that Curry's claims concerning the formation of Cabo Blanco should be arbitrated. Although Cabo Blanco was not referenced by the letter agreement or the Chesapeake sale contract, both tax advice and overriding royalties were referenced. As GPC correctly argues, the overriding royalties, which are the sole reason for the existence of Cabo Blanco, would never had been created if the sale had not occurred. Further, the letter agreement specifically contemplates tax advice, and the sale explicitly provided for the creation of overriding royalties. Prior to closing, the overriding royalties were created and assigned to Cabo Blanco for tax purposes. Thus, the record

---

[11]We note that Curry claimed, in an earlier petition, that she was obligated to pay 20 percent of the costs of the sale pursuant to the Agreement but only owns 5.23 percent of Cabo Blanco. Curry's later petitions drop the percentages but continue to allege overpayment of costs.

establishes that the overriding royalty interests formed part of the negotiations and were contemplated both by the letter agreement and the terms of the sale. The overriding royalties and the formation of Cabo Blanco arose out of, related to, and were in connection with the sale.

The letter agreement also contains disclaimers which indicate it was intended as much more than a mere cost-sharing agreement. These disclaimers waive any claim of negligence, attorney-client privilege, or any other fiduciary relationship. These disclaimers establish nonliabilty for various torts potentially arising out of the sale. The disclaimers indicate torts may relate to and be connected with the letter agreement.

Curry argues that these disclaimers are evidence that her claims do not relate to the contract. According to Curry, because the letter agreement disclaims any fiduciary relationship, the fiduciary relationship and other torts arise from the general obligations of law and do not relate to the contract. We disagree. The disclaimers, while waiving liability and expressly disclaiming the existence of a fiduciary relationship, are clear evidence that these claims and issues were contemplated by the parties—they are explicitly referenced in the letter agreement. The Texas Supreme Court has recognized that nonliability which "arises from connections with the contract" may be subject to the contract's arbitration clause. *See In re Vesta Ins. Grp., Inc.*, 192 S.W.3d 759, 761–62 (Tex. 2006) (orig. proceeding) (per curiam) (arbitration clause applied to tortious interference with contract claim).

As argued by GPC, artful pleading cannot prevent the application of an arbitration clause. "A court should not deny arbitration unless the court can say with positive assurance that an arbitration clause is not susceptible of an interpretation that would cover the claims at issue."

15

*Osornia*, 367 S.W.3d at 712. All of Curry's claims touch on the sale to Chesapeake. Curry explicitly seeks reimbursements for paying more than her proportionate share of the costs of negotiation. Without the contract, Curry would have had no obligation to pay costs of the negotiation. Curry also alleges fraud in the inducement and misrepresentation concerning the sale and payment of costs. The Texas Supreme Court has recognized that fraud, fraud in the inducement, and misrepresentation may "arise out of and relate to" a contract. *See Capital Income Props.-LXXX v. Blackmon*, 843 S.W.2d 22, 23 (Tex. 1992) (orig. proceeding) (per curiam); *In re J.D. Edwards World Solutions Co.*, 87 S.W.3d 546, 550 (Tex. 2002) (orig. proceeding) (per curiam); *see also Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 56 & n.13 (Tex. 2008) ("[T]he party opposing arbitration must show that the fraud relates to the arbitration provision specifically, not to the broader contract in which it appears . . . ."). The essence of all of Curry's tort claims is that she was tricked into agreeing to the sale to Chesapeake, tricked into agreeing to form Cabo Blanco, and tricked into assigning her overriding royalties to Cabo Blanco. All of the claims against GPC relate to or are connected with the subject matter of the letter agreement—the sale to Chesapeake.

It is undisputed that a party cannot be required to submit to arbitration any dispute which he has not contractually agreed to submit. *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960); *see In re Hawthorne Townhomes, L.P.*, 282 S.W.3d 131, 137 (Tex. App.—Dallas 2009, orig. proceeding). The claims against GPC relating to the sale to Chesapeake, the creation of the overriding royalty interests, and the creation of or operations of Cabo Blanco touch matters covered by the letter agreement. Since the letter

16

agreement contains a broad arbitration clause and any doubts must be resolved in favor of arbitration, the claims against GPC relating to the sale to Chesapeake, the creation of the overriding royalty interests, and the creation of or operations of Cabo Blanco against GPC are subject to arbitration.

## IV. Claims Against the Nonsignatories

Cabo Blanco, Dameris, and Lindberg did not sign the letter agreement. Since these parties are not bound by the terms of an agreement they did not agree to or sign, other facts must be present to require arbitration of the claims filed against them. GPC argues Curry's claims against these nonsignatory defendants should nonetheless be sent to arbitration under three theories: (1) equitable estoppel, (2) alter ego, and (3) agency.

The Texas Supreme Court has recognized six theories under which a nonsignatory can be bound to an arbitration clause: "(1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel, and (6) third-party beneficiary." *Kellogg Brown & Root, Inc.*, 166 S.W.3d at 739. Whether an arbitration agreement binds a nonsignatory is a gateway matter to be determined by the court, rather than the arbitrator. *Weekley Homes, L.P.*, 180 S.W.3d at 130. The party seeking arbitration bears the burden to establish that the arbitration agreement binds a nonsignatory. *See In re Citgo Petroleum Corp.*, 248 S.W.3d 769, 776 (Tex. App.—Beaumont 2008, orig. proceeding) (per curiam).

**A.** **The Claims Against Alfred, III, in his Official Capacity as an Officer and Director of GPC, Are Subject to Arbitration**

Both parties refer to Alfred, III, as a nonsignatory. The appellant's brief specifically defines the nonsignatory defendants as Cabo Blanco, Alfred, III, Dameris, and Lindberg and includes Alfred, III, in the headings discussing the Nonsignatories. The appellees' brief provides, "Neither Cabo Blanco nor Alfred III, Thad Dameris or Pam Lindberg, in the capacity as an officer or director of Cabo Blanco, is a signatory to the agreement allocating closing costs." The explicit terms of the letter agreement require, among other things, that Curry bear her proportionate share of all costs incurred by GPC in connection with the Chesapeake sale.

Alfred, III, argues on appeal that the claims against him should be sent to arbitration based on agency principles with no distinction between claims brought against him in his various capacities. The motion to compel giving rise to this appeal generally refers to Curry's claims against Alfred, III, collectively. The motion, though, does refer to Alfred, III, as an agent of Cabo Blanco in some locations and as an agent of GPC in others. We are required to look to the substance of a motion to judge its contents. *See State Bar of Tex. v. Heard*, 603 S.W.2d 829, 833 (Tex. 1980) (orig. proceeding); *see also Perry v. Cohen*, 272 S.W.3d 585, 588 (Tex. 2008) (per curiam) (issues on appeal construed liberally to cover every subsidiary question fairly included). We conclude that the substance of the motion claims Alfred, III, is an agent of both Cabo Blanco and GPC. Thus, we turn to the issue of whether the claims against Alfred, III, in his official capacity as an officer and director of GPC, are subject to arbitration.

18

The Texas Supreme Court has observed that contracting parties generally intend to include disputes about their agents. *Vesta Ins. Grp., Inc.*, 192 S.W.3d 762–63. Agents "may sometimes invoke an arbitration clause even if they themselves are nonsignatories and a claimant is not suing on the contract." *In re Kaplan Higher Educ. Corp.*, 235 S.W.3d 206, 209 (Tex. 2007) (orig. proceeding) (per curiam); *In re Wells Fargo Bank, N.A.*, 300 S.W.3d 818, 825 (Tex. App.—San Antonio 2009, orig. proceeding). An arbitration clause cannot be avoided by recasting the claims as torts against an owner, officer, agent, or affiliate, and "it is impractical to require every corporate agent to sign or be listed in every contract." *Kaplan Higher Educ. Corp.*, 235 S.W.3d at 209. It is uncontested that GPC is a signatory to the letter agreement and Alfred, III, is president of GPC.

We conclude that the claims against Alfred, III, in his official capacity as officer and director of GPC, relating to the sale to Chesapeake, the creation of the overriding royalty interests, and the creation of or operations of Cabo Blanco are subject to arbitration.

**B.     Equitable Estoppel Requires Arbitration of the Overpayment of Cost Claims Against the Nonsignatories**

The Nonsignatories first argue that the doctrine of equitable estoppel requires arbitration of the claims against them. They cite *Meyer v. WMCO-GP, L.L.C.*, 211 S.W.3d 302, 306 (Tex. 2006), for the proposition that equitable estoppel requires the arbitration of claims against nonsignatories in two circumstances: (1) when a claim made by a signatory against a nonsignatory seeks a direct benefit from the contract and (2) when a signatory raises claims of substantially intertwined or concerted misconduct on the part of a nonsignatory and another

19

signatory. We acknowledge that *Meyer*, which addressed the direct benefit prong, extensively quoted from *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000), and then stated that the quoted language was "a substantially correct statement of Texas law." *Meyer*, 211 S.W.3d at 306. The Nonsignatories argue that the second prong (substantially intertwined or concerted misconduct) of *Grigson* should apply in this case.

A year after its decision in *Meyer*, the Texas Supreme Court explicitly rejected the second prong of *Grigson*, which includes intertwined claims or concerted misconduct. *See In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 195 (Tex. 2007) (orig. proceeding). In so doing, the court distinguished *Meyer*, stating,

> We noted allegations of concerted misconduct in *Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 306–07 (Tex. 2006), but compelled arbitration because the plaintiff's claims depended on the underlying agreement, and thus were governed by principles of direct-benefits estoppel.

*Id.* at 191 n.22. Thus, the court, while noting *Meyer* is still good law, limited *Meyer* to the first prong of *Grigson*. *Id.* at 191–95. The court noted that the intertwined claims doctrine is "generally limited . . . to instances of strategic pleading by a signatory" and then explicitly rejected the concerted misconduct test. *Id.* at 194–95. The court reasoned, "As other contracts do not become binding on nonparties due to concerted misconduct, allowing arbitration contracts to become binding on that basis would make them easier to enforce than other contracts, contrary to the Arbitration Act's purpose." *Id.* at 194.

We will follow the Texas Supreme Court's explicit holding in *Merrill Lynch Trust* rather than its earlier dicta in *Meyer*. The application of the equitable estoppel doctrine to arbitration

20

clauses in Texas is limited to the direct benefit prong. *Id.* at 194–95. Therefore, we reject the Nonsignatories' concerted misconduct argument and will confine our analysis to direct benefit estoppel—the only form of equitable estoppel recognized in Texas.

The Nonsignatories' next argument is that, by accepting the Chesapeake negotiations, Curry accepted the benefit of the contract. In this context, equitable estoppel, or "'direct benefits estoppel,'" provides that a nonsignatory plaintiff is estopped from simultaneously attempting to seek benefits from the contract while attempting to avoid the contract's obligation to arbitrate disputes. *Kellogg Brown & Root, Inc*., 166 S.W.3d at 739. A claimant cannot "'have it both ways': it cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory.'" *Meyer*, 211 S.W.3d at 306 (quoting *Grigson*, 210 F.3d at 528).

The Texas Supreme Court has explained that "whether a claim seeks a direct benefit from a contract" depends on whether "liability arises solely from the contract or must be determined by refeence to it" or whether "liability arises from general obligations imposed by law." *Weekley Homes, L.P*., 180 S.W.3d at 132. Thus, only Curry's claims against the Nonsignatories for which liability arises from or requires reference to the letter agreement are claims seeking direct benefits from the letter agreement. For nonsignatories, actual dependence on the underlying contract must exist. *Merrill Lynch Trust*, 235 S.W.3d at 193 n.32 (citing *In re Humana Inc. Managed Care Litig*., 285 F.3d 971, 976 (11th Cir. 2002)). Thus, merely accepting the Chesapeake negotiations is not sufficient.

21

Only Curry's claims against the Nonsignatories seeking damages for overpayment of costs seek to derive a benefit from the letter agreement. Although Curry did not bring a contract claim, she alleged numerous tort claims, such as fraud and fraudulent misrepresentation, that she contends resulted in her paying more than her proportionate share of the costs and expenses associated with the Chesapeake sale, the creation of overriding royalty interests, and/or the creation of Cabo Blanco. Curry's obligation to pay the costs was established by the letter agreement, and the overpayment of those costs, while brought as a tort claim, cannot be decided without reference to the contract. Because the right Curry seeks to enforce—the right not to pay more than her proportionate share of the costs—requires reference to the contract, any fraud or misrepresentation claim stemming from an alleged interference with that right seeks a direct benefit from the letter agreement. "When a party's right to recover and its damages depend on the agreement containing the arbitration provision, the party is relying on the agreement for its claims." *Meyer*, 211 S.W.3d at 307. Therefore, Curry's allegations that she was overcharged and misled by misrepresentations concerning the costs and expenses associated with the Chesapeake sale, the creation of overriding royalty interests, and/or the creation of Cabo Blanco are subject to arbitration.

Curry's remaining allegations against the Nonsignatories would not be subject to arbitration pursuant to equitable estoppel. We note that the pleadings are vague and that the source of the obligations for many of the claims is not entirely clear. However, Cabo Blanco and its directors failed to file special exceptions requesting greater specificity. The burden rested on Cabo Blanco and its directors to establish that liability for these claims requires reference to the

22

contract.[12] *See Citgo Petroleum*, 248 S.W.3d at 776. The record does not establish that the remaining claims require reference to the contract. Cabo Blanco and its directors failed to show that these claims did not arise out of general obligations imposed by law. As the Texas Supreme Court has observed, "nonparties generally must arbitrate claims if liability arises from a contract with an arbitration clause, but not if liability arises from general obligations imposed by law." *Vesta Ins. Grp., Inc.*, 192 S.W.3d at 761. Based on the record provided, equitable estoppel does not require arbitration of the remaining claims against the Nonsignatories.[13]

### C. The Record Contains No Evidence of Alter Ego

Cabo Blanco and its directors argue that, since Curry alleges GPC and Cabo Blanco are the alter egos of Alfred, III, the arbitration clause should apply to Cabo Blanco. The alter-ego doctrine permits piercing of the corporate veil when there is a unity between the corporation and the individual such that the corporation's separateness has ceased and holding only the corporation liable would be unjust. *Sparks v. Booth*, 232 S.W.3d 853, 868 (Tex. App.—Dallas 2007, no pet.). Because the record contains insufficient evidence of alter ego, it is not necessary for us to decide whether a corporation can use the alter-ego doctrine to pierce its own corporate veil.

---

[12]The presumption that doubts should be resolved in favor of arbitration applies only after the existence of an arbitration agreement between the parties has been established. *See Ellis*, 337 S.W.3d at 862. As noted above, it is uncontested that Cabo Blanco and its directors are not signatories to the letter agreement.

[13]These claims are that the Nonsignatories (1) fraudulently misrepresented that they were acting in Curry's best interest in operating Cabo Blanco, (2) fraudulently refused to provide ownership evidence of Cabo Blanco, (3) fraudulently overcharged Curry's interests, (4) violated duties as directors of Cabo Blanco in failing to disclose material facts, (5) breached fiduciary duties, (6) were negligent, (7) benefitted from unjust enrichment, and (8) breached contracts.

A corporate veil can be pierced based on proof that the corporation is an alter ego. In determining whether a corporation is an alter ego, a court may consider evidence of

> (1) the payment of alleged corporate debts with personal checks or other commingling of funds; (2) representations that the individual will financially back the corporation; (3) the diversion of company profits to the individual for his personal use; (4) inadequate capitalization; and (5) other failure to keep corporate and personal assets separate.

*Id.*. Further, this Court has observed, "There must be something more than mere unity of financial interest, ownership, and control . . . ." *Endsley Elec., Inc. v. Altech, Inc.*, 378 S.W.3d 15, 24 (Tex. App.—Texarkana 2012, no pet.).

The Nonsignatories argue that we must assume Curry's claims are true, citing *In re Great W. Drilling, Ltd.*, 211 S.W.3d 828, 841 (Tex. App.—Eastland 2006, orig. proceeding), *mand. granted*, *In re Gulf Exploration, LLC*, 289 S.W.3d 836, 838 (Tex. 2009) (orig. proceeding). First, we note that the Texas Supreme Court disagreed with the Eastland Court and granted mandamus relief. *See In re Gulf Exploration, LLC*, 289 S.W.3d 836, 838–39 (Tex. 2009) (orig. proceeding). Therefore, *Great West Drilling* has rather limited precedential value. Second, GPC is citing *Great West Drilling* out of context. The Eastland Court held that when determining the scope of an arbitration clause, we must assume the plaintiff's claims are true. *Great W. Drilling, Ltd.*, 211 S.W.3d at 841. The Eastland Court did not make this statement in the context of whether an arbitration agreement applies to nonsignatories.

We disagree with GPC that we must presume Curry's pleadings are true and that evidence of alter ego is not required. The Dallas Court of Appeals and several Texas United States District Courts have refused to order nonsignatories to submit their claims to arbitration in

24

the absence of evidence of alter ego. *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lockey Inv. Grp., L.L.C.*, 195 S.W.3d 807, 817 (Tex. App.—Dallas 2006, orig. proceeding); *see also DAC Surgical Partners, P.A. v. United Healthcare Servs.*, No. H-11-1355, 2011 U.S. Dist. LEXIS 88560 (S.D. Tex. Aug. 10, 2011) (mem. and order denying motion to compel arbitration); *Andres Holding Corp. v. Villaje Del Rio, Ltd.*, No. SA-09-CA-127-XR, 2009 U.S. Dist. LEXIS 63686 (W.D. Tex. July 24, 2009) (order denying motion to compel arbitration); *cf. Mohamed v. Auto Nation USA Corp.*, 89 S.W.3d 830, 838 n.14 (Tex. App.—Houston [1st Dist.] 2002, orig. proceeding) (refusing to bind nonsignatories to arbitration when nonsignatories not parties to lawsuit and "summary evidence did not show these relationships"). We agree; in order for an arbitration clause to apply to nonsignatories, the party seeking arbitration must introduce evidence supporting a finding of alter ego.

The record contains no evidence that Cabo Blanco is the alter ego of Alfred, III.[14] We overrule the Nonsignatories' alter-ego argument.

### D.    Agency Does Not Require Arbitration of the Remaining Claims

Dameris and Lindberg argue that, because Cabo Blanco is the alter ego of Alfred, III, the arbitration clause applies to Cabo Blanco's agents. This agency argument is premised on the erroneous assumption that Cabo Blanco is the alter ego of Alfred, III. Since we have rejected the alter-ego argument, we, likewise, reject this agency argument.

---

[14]This finding relates to this interlocutory appeal and would not preclude the parties from offering such evidence at a trial on the merits.

25

Except for the overpayment of costs claims, Curry's claims against Cabo Blanco, Dameris, Lindberg, and Alfred, III, both individually and in his official capacity as an officer and director of Cabo Blanco, are not subject to arbitration.

## V.     Conclusion

We reverse and render judgment that the following claims should be submitted to arbitration:  (1) the claims against GPC and Alfred, III, in his official capacity as an officer and director of GPC relating to the sale to Chesapeake, the creation of the overriding royalty interests, and the creation of or operations of Cabo Blanco and (2) the claims against Cabo Blanco, Dameris, Lindberg, and Alfred, III, individually and in his official capacity as a director of Cabo Blanco, concerning the overcharges or misrepresentations of the costs and expenses associated with the Chesapeake sale, the creation of overriding royalty interests, and/or the creation of Cabo Blanco.  The remaining claims are not subject to arbitration and are remanded to the trial court for further proceedings.  *See* TEX. R. APP. P. 43.2, 43.3.


                                    Jack Carter
                                    Justice


Date Submitted:     September 26, 2013
Date Decided:       January 9, 2014


26