

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-17-00453-CV
_____

HART OF TEXAS CATTLE FEEDERS, LLC, JAMES MICHAEL HAYES,
INDIVIDUALLY, LYNN LANDRUM, INDIVIDUALLY, AND
HENRY O. PICKETT II, INDIVIDUALLY,
APPELLANTS

V.

BONSMARA NATURAL BEEF COMPANY, LLC AND GEORGE CHAPMAN,
APPELLEES

On Appeal from the 242nd District Court
Castro County, Texas
Trial Court No. B9975-1509; Honorable Kregg Hukill, Presiding

January 9, 2019

## MEMORANDUM OPINION

Before CAMPBELL, PIRTLE, and PARKER, JJ.

Appellants, Hart of Texas Cattle Feeders, LLC, and its owners, James Michael Hayes, Lynn Landrum, and Henry O. Pickett II, appeal from a judgment issued in favor of Appellees, Bonsmara Natural Beef Company, LLC and its president, George Chapman,

following a jury trial of various causes of action arising out of a custom cattle feeding agreement (the "Agreement") between Castro County Feeders I, Ltd. (Hart's predecessor) and Bonsmara. By its verdict, the jury found that both Hart and Bonsmara failed to comply with the terms of the Agreement and it made findings regarding the damages proximately caused by the respective breaches. The jury also determined that Hayes, Landrum, and Pickett were individually responsible for damages caused by Hart's conduct. After off-setting the damage awards, the trial court awarded Bonsmara and Chapman a net recovery of $366,445.70, plus court costs and attorney's fees in the sum of $227,272.25, through trial. The judgment also awarded Bonsmara and Chapman recovery of contingent attorney's fees in the event of an unsuccessful appeal of the trial court's judgment. By this appeal, Hart, Hayes, Landrum, and Pickett raise eight issues. Because the first issue, i.e., whether the trial court erred when it denied Hart's motion to arbitrate the dispute in this suit per the terms of the Agreement, is dispositive of this appeal, we will only consider that issue. Our disposition of that issue renders moot Bonsmara and Chapman's cross-appeal asserting the evidence was insufficient to award Hart any offsetting damages for its breach of contract cause of action. Accordingly, we reverse the trial court's judgment and remand the cause to the trial court with instructions to render an order compelling the parties to arbitrate their dispute.

BACKGROUND

BONSMARA CATTLE

The genesis of Bonsmara's cause of action is the alleged breach of the Agreement, a custom cattle feeding agreement binding upon both Bonsmara and Hart. In 1997, Chapman imported the first full-blooded Bonsmara cattle from Africa into the United States. Research projects conducted by AgriLife Research, a division of Texas A&M

University, and at universities in South Africa indicated that Bonsmara cattle could produce a high-quality product that was natural, tender, flavorful, and low in fat, as well as capable of being economically produced.

One goal of the cattle program was to market Bonsmara cattle beef for sale as "natural" cattle thereby qualifying for premium prices in excess of the price of commercial beef.[1] To assure that the cattle entered feed yards in a condition to gain weight as "natural" cattle, Bonsmara contracted with certain ranchers to raise cattle in accordance with its Bonsmara Natural Breed Program (the "program").

In the program, Bonsmara calves were raised and sold at livestock auctions or held in pens for two weeks to wean calves before eventual sale several months later. The weaned cows could then be introduced to a feed lot or finishing yard after learning to eat from a trough. If cattle were too light to be introduced to the feed lot, they would be put out to pasture before being introduced to the feed lot. When the cattle were slaughter weight, they were ultimately sold at a premium to a slaughtering facility that was a part of the program. In this case, Bonsmara contracted with Sysco Corporation to buy its "natural" cattle.

HART OF TEXAS CATTLE FEEDERS, LLC

In September 2010, Hart was formed by James Michael Hayes (70% owner and president), Lynn Landrum (15% owner and vice-president), and Henry O. Pickett II, (15% owner and secretary/treasurer). The new organization held regular owner meetings throughout the year to review Hart's and its customers' financial position. Hart also hired

---

[1] Cattle that are fed growth hormones or that develop health problems requiring treatment with antibiotics or a similar medication do not qualify as "natural" cattle and are ineligible to be sold for premium prices.

David "Smiley" Burnett to act as its day-to-day manager of the feed lot. Burnett had been a manager at Quality Beef prior to joining Hart and was familiar with the Bonsmara cattle program.

Under the terms of the Agreement, Hart was contractually obligated to supply, on an ongoing basis, feed, vitamins, minerals, and medicine for consumption by Bonsmara cattle delivered to Hart for feeding at its feed yard facilities or other property. The Agreement also provided that Hart did not have any liability for injury, damage, loss, or death of Bonsmara's cattle arising out of the performance of the Agreement unless the injury, damage, loss, or death was due to a negligent or willful act or omission of Hart at its feed yard facilities. The parties agreed there would be no presumption of negligence and that the feed yard's standard of care would be only that degree of care exercised by an ordinary prudent feed yard operator in the area. The Agreement further provided that, if a party retained an attorney to enforce the Agreement and prevailed in litigation, attorney's fees and court costs incurred by any party could be recovered. The Agreement was also "subject to, and governed by, the laws of the State of Texas."

The Agreement also contained an arbitration provision that stated as follows:

**ANY DISPUTE OR CONTROVERSY ARISING UNDER, OUT OF, OR IN CONNECTION WITH OR IN RELATION TO THIS CATTLE FEEDING AGREEMENT AND ANY AMENDMENT THEREOF, OR THE BREACH THEREOF, MAY *AT THE SOLE OPTION AND DISCRETION OF [HART]*, BE DETERMINED AND SETTLED BY ARBITRATION TO BE HELD IN AMARILLO, TEXAS, IN ACCORDANCE WITH THE RULES THEN APPLICABLE UNDER THE ARBITRATION PROGRAM OF THE TEXAS CATTLE FEEDERS ASSOCIATION. IF THE CONTROVERSY IS DECIDED BY ARBITRATION, ANY AWARD RENDERED THEREIN SHALL BE FINAL AND BINDING ON EACH OF THE PARTIES HERETO, AND JUDGEMENT MAY BE ENTERED THEREON IN THE STATE COURT OF THE STATE OF TEXAS FOR THE COUNTY OF POTTER.**

(Emphasis in original.)

PROCEDURAL HISTORY

In September 2015, Bonsmara filed its *Original Petition* and in June 2017, filed its *First Amended Original Petition* alleging that Hart was liable for breach of the Agreement, negligent feeding and care of Bonsmara's cattle, civil conspiracy, declaratory judgment, and unjust enrichment. The amended petition also alleged that Hart's status as a corporate entity should be disregarded and Hart's owners should be held individually and jointly liable for the acts and/or omissions of Hart and its employees. Hart responded by eventually filing its *Second Amended Answer and Counterclaim* for breach of contract seeking damages in excess of $300,000.

In November 2015, Hart filed a motion to dismiss the suit and compel arbitration based upon the Agreement. The trial court denied Hart's motion and Hart filed a mandamus action in this court seeking an order vacating the trial court's ruling and instructing the trial court to stay proceedings while the parties were in arbitration. In June 2016, this court issued a *Memorandum Opinion* denying Hart's petition for mandamus. *See In re Hart of Tex. Cattle Feeders, Inc.,* No. 07-16-00194-CV, 2016 Tex. App. LEXIS 5958, at *2-5 (Tex. App.—Amarillo June 2, 2016, orig. proceeding). Writing for this court, Justice Hancock held that Hart had a right to pursue an appeal from the trial court's order denying the motion to compel arbitration and as a result, it had failed to show that it was without an adequate remedy by appeal or otherwise establish that it was entitled to the extraordinary relief of mandamus. *Id.* at *4-5.

Between August 8 and 15, a five-day jury trial was held. At the trial's conclusion, the trial court issued its judgment that Hart, Hayes, Landrum, and Pickett were jointly and severally liable to Bonsmara and Chapman for $366,445.70 (the sum of money the jury

5

determined was owed to Bonsmara, offset by the sum of money the jury determined was owed to Hart).  The judgment also awarded to Bonsmara and Chapman the sum of $227,272.25 for attorney's fees through trial, plus contingent attorney's fees in the event of an unsuccessful appeal.  This appeal followed.

ISSUE ONE—ARBITRATION

STANDARD OF REVIEW

Under Texas law, a written agreement to arbitrate is valid and enforceable if an arbitration agreement exists and the claims a party seeks to have arbitrated are claims that fall within the scope of the parties' arbitration agreement.  TEX. CIV. PRAC. & REM. CODE ANN. §§ 171.001, 171.021 (West 2011).  To determine whether a party's claims fall within an arbitration agreement's scope, we focus on the complainant's factual allegations rather than the legal causes of action asserted.  *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 754 (Tex. 2001).  Because the public policy of the State strongly favors arbitration, a court should not deny a request to order the parties to arbitrate when a valid agreement to arbitrate exists unless the arbitration clause is not susceptible to being interpreted in a manner that would require the parties to arbitrate the dispute.  *Williams Indus. Inc. v. Earth Dev. Sys. Corp.*, 110 S.W.3d 131, 137 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

A party seeking to compel arbitration must show that (1) there is a valid arbitration agreement and (2) the claim raised falls within that agreement's scope.  *In re Kellogg, Brown & Root, Inc.,* 166 S.W.3d 732, 737 (Tex. 2005) (orig. proceeding).  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 171.001(a) (West 2011).  Once the party moving for arbitration establishes that a valid arbitration agreement exists, the burden of showing that the

6

dispute is one that is not arbitrable falls on the party opposed to referring the matter to arbitration. *McReynolds v. Elston*, 222 S.W.3d 731, 740 (Tex. App.—Houston [14th Dist.] 2007, orig. proceeding). To determine whether the dispute at issue falls within the scope of arbitration, courts are required to focus on the facts that are alleged in the pleadings, not the legal causes of action that have been pleaded. *Id.* A strong presumption exists in favor of arbitration, so courts are required to resolve doubts regarding arbitrability in favor of referring the dispute to arbitration. *Ellis v. Schlimmer*, 337 S.W.3d 860, 862 (Tex. 2011) (per curiam).

When reviewing a trial court's decision on a motion to compel arbitration, the ruling is reviewed under a *de novo* standard. *Sinclair Group, Ltd. v. Haggblom*, 548 S.W.3d 40, 44 (Tex. App.—Beaumont 2018, no pet.). Furthermore, the validity of the agreement is a legal question. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2002).

APPLICABLE LAW

"Gateway matters," such as the validity of an arbitration agreement, are decided by the court rather than an arbitrator; *In re Weekly Homes, L.P.*, 180 S.W.3d 127, 130 (Tex. 2005) (orig. proceeding), and ordinary principles of state contract law determine whether a valid agreement to arbitrate exists. *In re Kellogg*, 166 S.W.3d at 738. Because arbitration is contractual in nature, neither Texas law nor the Federal Arbitration Act generally require parties to arbitrate when they have not agreed to do so. *Id.* However, "non-signatories to an arbitration agreement can sometimes compel arbitration or be compelled to arbitrate." *Steer Wealth Mgmt., LLC v. Denson*, 537 S.W.3d 558, 565 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (quoting *Amateur Athletic Union of the U.S., Inc. v. Bray*, 499 S.W.3d 96, 103-04 (Tex. App.—San Antonio 2016, no pet.)). *See also Arthur*

7

*Anderson LLP v. Carlisle*, 556 U.S. 624, 632, 129 S. Ct. 1896, 173 L. Ed. 2d 832 (2009) (holding that litigant who was not party to relevant arbitration agreement may invoke provisions of the FAA if relevant state contract law allows a non-party to enforce the agreement). Whether a non-signatory may require that a signatory to an agreement arbitrate a contractual dispute is a "gateway matter" involving the validity that must be decided by the court. *In re Labatt Food Serv.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding). *See Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83-84, 123 S. Ct. 588, 154 L. Ed. 2d 491 (2002).

Non-signatories to an arbitration agreement may be bound when rules of law or equity would bind them to the contract generally. *Labatt*, 279 S.W.3d at 644. According to principles of contract and agency law, arbitration agreements may bind non-signatories under any of six theories: (1) incorporation by reference, (2) assumption, (3) agency, (4) alter ego, (5) equitable estoppel, and (6) third-party beneficiary. *In re Kellogg*, 166 S.W.3d at 739. Direct benefits estoppel is a type of equitable estoppel. *Rachal v. Reitz*, 403 S.W.3d 840, 845-46 & n.5 (Tex. 2013) (explaining that the Texas Supreme Court expressly adopted the federal doctrine of direct benefits estoppel in *In re Kellogg*, 166 S.W.3d at 730).

The doctrine of direct benefits estoppel applies when a claimant seeks "direct benefits" under a contract containing an arbitration clause and that question is determined by "the substance of the claim, not artful pleading." *G.T. Leach Builders, LLC v. Sapphire V.P., L.P.*, 458 S.W.3d 502, 527 (Tex. 2015). "It is not enough, however, that the party's claim 'relates to' the contract that contains the arbitration agreement." *Id.* Rather, the claims must "depend on the existence of the contract"; *id.* at 527-28 (quoting *Meyer v.*

8

*WMCO-GP, LLC*, 211 S.W.3d 302, 305 (Tex. 2006)), and "the alleged liability must arise[] solely from the contract or must be determined by reference to it." *G.T. Leach Builders, LLC*, 458 S.W.3d at 528.

ANALYSIS

Here, the parties do not dispute whether there is a valid arbitration agreement between Bonsmara and Hart—both parties to the Agreement agreed to arbitrate "[a]ny dispute or controversy arising out of, or in connection with or in relation to the cattle feeding agreement[s]" including "any amendment thereof, or the breach thereof. . . ." Bonsmara disputes whether the individual defendants, Hayes, Landrum, and Pickett, Hart's owners and non-signatories to the Agreement in their individual capacities, could invoke the arbitration clause to force the arbitration of disputes arising out of the Agreement. The trial court determined that they could not. We disagree.

The Texas Supreme Court has observed that contracting parties generally intend to include disputes concerning their agents. *In re Vesta Ins. Grp., Inc.*, 192 S.W.3d 759, 762-63 (Tex. 2006). Agents may sometimes invoke an arbitration clause even if they themselves are non-signatories and the claimant is not suing on the contract. *In re Kaplan Higher Educ. Corp.*, 235 S.W.3d 206, 209 (Tex. 2007) (orig. proceeding) (per curiam); *In re Wells Fargo Bank, N.A.*, 300 S.W.3d 818, 825 (Tex. App.—San Antonio 2009, orig. proceeding). Moreover, an arbitration clause cannot be avoided simply by recasting contract claims as torts against an owner, officer, or affiliate. *In re Kaplan Higher Educ. Corp.*, 235 S.W.3d at 209 (finding that it would be "impractical" to require that every corporate agent sign or be listed in every contract in order to circumvent the avoidance of arbitration provisions by artful pleadings). Here, it is uncontested that Hart and

9

Bonsmara are bound by the Agreement and that Hayes, Landrum, and Pickett are Hart's owners and officers.

The linchpin of the causes of action asserted in Bonsmara's amended petition is the Agreement between Hart and Bonsmara. Bonsmara's first two causes of action are breach of contract and negligent performance of Hart's contractual duties. Bonsmara's third cause of action asserts Hart committed fraud in the performance of the Agreement. The fourth cause of action is against Hayes, Landrum, and Pickett for the negligent hiring and supervision of Hart's management personnel and that cause of action seeks recovery of the losses due to the alleged breach of the Agreement. Bonsmara's fifth cause of action alleges that Hayes, Landrum, and Pickett directed and controlled the actions and omissions of Hart in the performance of its contractual obligations to Bonsmara regarding Hart's hedging program. In its fifth cause of action, Bonsmara seeks to disregard Hart's corporate nature and alleges Hart is a sham and "mere tool" of Hayes, Landrum, and Pickett, making them personally liable for Hart's actions and omissions. Bonsmara's sixth cause of action is that Hart and its employees acted as the agents of Hayes, Landrum, and Pickett, with actual, implied, or apparent authority. The seventh cause of action, civil conspiracy, alleges Hayes, Landrum, and Pickett, acting as Hart's agents, employees, and/or representatives conspired to cover up their negligent performance and fraud in connection with the performance of the Agreement. In its eighth cause of action, Bonsmara seeks a declaration that Hart, Hayes, Landrum, and Pickett materially altered Bonsmara's contractual indebtedness required to be discharged by Chapman's obligations pursuant to a guaranty executed in connection with the Agreement. For its ninth cause of action, Bonsmara asserts that Hayes, Landrum, and Pickett violated the Federal Commodity Exchange Act by virtue of their actions and omission in connection

with Hart's hedging program. And finally, Bonsmara asserts a cause of action for unjust enrichment, seeking damages for breach of the Agreement. Plainly, each of the causes of action in Bonsmara and Chapman's amended petition rely on the existence of the Agreement in order to establish the duties owed to Bonsmara as well as the appropriate measure of damages.[2] "When a party's right to recover and its damages depend on the agreement containing the arbitration provision, the party is relying on the agreement for its claims." *Meyer*, 211 S.W.3d at 307.

When Bonsmara executed the Agreement, it anticipated that subsequent disagreements would be arbitrated. Bonsmara and Chapman cannot now have it both ways. That is, they cannot seek to hold Hart, Hayes, Landrum, and Pickett liable pursuant to duties imposed by an agreement containing an arbitration clause, while at the same time denying the applicability of that clause simply because the individual appellants are non-signatories. *Id.* at 306. Accordingly, we find that the causes of action asserted by Bonsmara and Chapman against Hart fall within the scope of the Agreement and conclude that the causes of action against Hayes, Landrum, and Pickett in their official capacities as owners, officers, and directors of Hart are also subject to arbitration. *See Glassell Producing Co. v. Jared Res., Ltd.*, 422 S.W.3d 68, 81 (Tex. App.—Texarkana 2014, no pet.).[3] Accordingly, the first issue is sustained and all other issues including Bonsmara and Chapman's cross-appeal are pretermitted. TEX. R. APP. P. 47.1.

---

[2] The trial record also supports this conclusion.

[3] Bonsmara also asserts that the arbitration provision is unenforceable because none of the parties to the Agreement were members of the Texas Cattle Feeders Association. The Agreement plainly requires any arbitration to be conducted "in accordance with the rules applicable under the arbitration program of the Texas Cattle Feeders Association." The Agreement does not require that the Texas Cattle Feeders Association *conduct* the arbitration.

11

CONCLUSION

The trial court's judgment is reversed, and we remand the cause to the trial court with instructions to render an order compelling the parties to arbitrate their disputes.


Patrick A. Pirtle
Justice