**Opinion issued July 23, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-23-00829-CV**

———————————

**SPAWGLASS CIVIL CONSTRUCTION, INC., Appellant**

**V.**

**THE HANOVER INSURANCE COMPANY, Appellee**

---

**On Appeal from the 165th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-22284**

---

**MEMORANDUM OPINION**

Appellant SpawGlass Civil Construction, Inc. is the general contractor for a public construction project in Houston, Texas. SpawGlass retained Horizon Excavation, Inc. to perform work as a subcontractor for the project, and Appellee Hanover Insurance Company issued a performance bond to guarantee Horizon's

performance. SpawGlass filed suit against Horizon and Hanover for breach of their respective contracts, and it later moved to compel arbitration of its disputes against both parties. Horizon conceded that SpawGlass's claims against it were subject to arbitration, but Hanover opposed arbitration arguing it was neither a party nor a signatory to the subcontract containing the arbitration clause and further that the claims against it fell outside the scope of the arbitration provision.

The trial court granted SpawGlass's motion to compel arbitration against Horizon, but it denied the motion as it concerns Hanover. In this interlocutory appeal, SpawGlass argues that the trial court erred in denying its motion to compel arbitration against Hanover because (1) the subcontract's arbitration clause was incorporated by reference into the performance bond issued by Hanover, (2) Hanover is Horizon's successor under the subcontract, and (3) Hanover is estopped from denying that it is bound by the subcontract's arbitration clause because Hanover sought and obtained direct and substantial benefits under the subcontract.

We reverse the trial court's order and we remand the matter to the trial court for entry of an order compelling arbitration of SpawGlass's claims against Hanover.

**Background**

In December 2021, Houston Parks Board LGC, Inc. and SpawGlass executed a prime contract for SpawGlass to act as general contractor for the construction of

2

the Upper Brays Bayou Greenway – Segment BR26 Project in Houston, Texas ("Project"). The Project involved construction of a greenway from Braeburn Glen Boulevard to Eldridge Parkway in southwest Houston.

## A.      Horizon's Subcontract

In early 2022, SpawGlass and Horizon signed Subcontract No. 5021049-0009 ("Subcontract") under which Horizon agreed to furnish specified construction services for the Project as a subcontractor to SpawGlass. The Subcontract defines SpawGlass as the Contractor and Horizon as the Subcontractor. Section 9 of the Subcontract states that SpawGlass, Horizon, and their "heirs, executors, administrators, successors, and permitted assigns . . . agree to the full performance of the covenants and agreements herein specified."[1]

Horizon's scope of work is set forth in Exhibit A to the Subcontract. With respect to the timing of performance, Section 4.2, entitled "Subcontractor's Schedule," states that Horizon is required to complete each portion of its work in a prompt and diligent manner in compliance with the Subcontract Schedule, and Section 24.18 provides that "time is of the essence." Section 23.11 of the Subcontract defines "Events of Default" by Horizon, and the events include (1) refusing or neglecting to "supply a sufficient number of properly qualified

---

[1]      The Subcontract does not define "heirs, executors, administrators, successors, and permitted assigns."

3

workers or a sufficient quantity of materials of proper quality," (2) failing to "promptly pay sub-subcontractors, suppliers, materialmen, or laborers," and (3) giving "Contractor a reasonable basis to doubt that the Subcontractor's Work can be completed for the unpaid portion of the Subcontractor's Price or within the required time."

The Subcontract contains a mandatory arbitration clause requiring arbitration of disputes "between Contractor and Subcontractor." Section 21.4 of the Subcontract provides:

> ELECTION OF ARBITRATION OR LITIGATION. In the event of a dispute between Contractor and Subcontractor, Contractor, in its sole option, may elect to arbitrate such dispute in the manner provided below, or to litigate the dispute in a forum with jurisdiction to decide the dispute. . . . The award rendered by the arbitrator shall be final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction . . . .

## B.     Hanover's Performance Bond

Section 7 of the Subcontract requires Horizon to provide SpawGlass with payment and performance bonds in the full amount of the Subcontract price, which is "a sum not to exceed" $2,168,535.92. Pursuant to the Subcontract, Hanover issued payment and performance bonds to Horizon for SpawGlass's benefit, and Horizon delivered those bonds to SpawGlass.

The Performance Bond states that the Subcontract between SpawGlass and Horizon "is by reference made a part hereof the same as if it were set out verbatim

4

herein." The Performance Bond, which defines Horizon as the Principal, Hanover as the Surety, and SpawGlass as the Obligee, further states:

> Whenever Principal shall be, and declared by, Obligee to be in default under the Subcontract, the Obligee having performed Obligee's obligations thereunder, the Surety shall promptly remedy the default or shall promptly:
>
> (1)   Complete performance of the work in accordance with the terms and conditions of the Subcontract and Contract Documents; or
>
> (2)   Obtain a bid or bids for completion of the Subcontract in accordance with its terms and conditions, and, upon determination by Surety of the lowest responsible bidder, arrange for a contract between such bidder and Obligee, and make available as work progresses sufficient funds to pay the cost of completion less the balance of the Subcontract Price; but not exceeding, including other costs and damages for which the Surety may be liable hereunder, the amount set forth in the first paragraph hereof. The term of the "balance of the Subcontract Price" as used in this paragraph shall mean the total amount payable by Obligee to Principal under the Subcontract and any amendments thereto, less the amount properly paid by Obligee to Principal.

Unlike the Subcontract, the Performance Bond does not contain an arbitration clause.

### C.   Performance of the Work under the Subcontract and Alleged Default

On April 18, 2022, Horizon commenced work under the Subcontract. SpawGlass claims that by May 6, 2022, Horizon was already in non-compliance with the Project schedule and that Horizon "continued its pattern of delinquent performance falling further and further behind." In August 2022, SpawGlass learned

5

that "several [of Horizon's] employees were not being paid and a meeting was scheduled to address that and other concerns." According to SpawGlass, it began receiving notices from Horizon's vendors in September 2022, stating they had not been paid for materials and equipment furnished to Horizon.

On October 5, 2022, SpawGlass sent a "Notice of Default and 72-Hour Opportunity to Cure" to Horizon pursuant to Section 23.1 of the Subcontract, and SpawGlass sent a courtesy copy of the notice to Hanover. In the October notice, SpawGlass alleged that Horizon had defaulted on the Subcontract by refusing or neglecting to "supply a sufficient number of properly qualified workers or a sufficient quantity of materials of proper quality" and failing to "promptly pay sub-subcontractors, suppliers, materialmen, or laborers." The October notice directed Horizon to cure these defaults by (1) providing a makeup schedule to complete specified work by October 31, 2022, (2) providing the required amount of personnel to complete the scope of work without delaying SpawGlass or other subcontractors, (3) beginning other specified work by October 10, 2022, and (4) paying remaining outstanding balances to vendors, failing which SpawGlass would continue issuing joint checks.

On October 9, 2022, Horizon emailed a proposed makeup or "look ahead" schedule to SpawGlass for SpawGlass's consideration "in deciding [Horizon's] intent to comply with [SpawGlass's] demand letter." Horizon informed SpawGlass

6

that the "schedule w[ould] be met by using 3 crews for concrete pay items . . . in addition to the pipe crew currently on site." The schedule addressed the entirety of the work listed by SpawGlass in Attachment A to the October notice.

On November 10, 2022, SpawGlass sent a second Notice of Default to Horizon, and it sent a courtesy copy of the notice to Hanover. SpawGlass alleged that Horizon had failed to cure its default under the Subcontract, and it thus placed Horizon "formally in default of the Subcontract." Pursuant to the terms of the Performance Bond, SpawGlass demanded that Hanover remedy Horizon's default and ensure the completion of Horizon's obligations under the Subcontract by one of the two methods of completion provided for under the Performance Bond. The November notice stated:

> Be advised that Horizon and its surety will be held liable for all costs and/or damages that SpawGlass may incur due to Subcontractor's failure to comply with the Subcontract. By copy hereof, Hanover insurance is hereby notified of Subcontractor's default and failure to cure, and SpawGlass demands that Hanover Insurance perform pursuant to its payment and/or performance bond #1.020114. To the extent Hanover Insurance needs any additional information to promptly process and address this claim, please contact the undersigned.
>
> Nothing in this correspondence is intended to prevent or prohibit the Subcontractor from continuing to perform contract work.

On December 12, 2022, Hanover sent SpawGlass a proposed takeover agreement that contemplated Hanover contracting with a single completion contractor who Hanover would then pay to cure Horizon's default and complete

7

Horizon's scope of work under the Subcontract. According to SpawGlass, the takeover agreement was never executed because Hanover failed to identify the specific completion contractor with whom Hanover would contract to complete Horizon's scope of work.

On January 3, 2023, Hanover executed a "Completion Subcontract" with J&M Concrete Services, LLC, under which J&M agreed to complete a portion of Horizon's scope of work under the Subcontract. The Completion Subcontract, which incorrectly recited that Hanover and SpawGlass had "entered into a Takeover Agreement dated January 2, 2023" and incorporated that non-existing agreement by reference, states that the takeover agreement "sets forth the remaining scope of work for the work of this Subcontract" which the Completion Subcontract defines as the "Poured in Place Wingwalls ("Remaining Work") to be completed by Surety under the Subcontract."[2] The terms of the Completion Subcontract required Hanover to pay J&M for its work on the Project.

According to SpawGlass, the Completion Subcontract was negotiated between Hanover and J&M without any involvement or agreement from SpawGlass, and SpawGlass is not a party to the Completion Subcontract. It is undisputed that

_____

[2] Although the proposed takeover agreement is not included in the appellate record, the record reflects that Hanover retained J&M to complete the portion of the work under the Subcontract that SpawGlass alleged Horizon had failed to complete on time, as set forth in SpawGlass's default notices.

8

although Hanover and SpawGlass never entered into a takeover agreement for the completion of the Remaining Work, J&M performed some of the Remaining Work, as it was obligated to under the Completion Subcontract.

In January 2022, Hanover submitted Pay Application #7 to SpawGlass in connection with J&M's work under the Completion Subcontract, and it requested payment directly for itself for J&M's work. SpawGlass responded to Hanover that same day directing Hanover to revise and resubmit Pay Application #7 in compliance with the terms of the Subcontract.

On February 10, 2023, counsel for SpawGlass sent Horizon and Hanover a supplemental notice of default claiming default by Horizon and Hanover based on their alleged continued failure to provide sufficient manpower and effort on the Project and their failure to provide a recovery schedule to cure Horizon's default. SpawGlass alleged that, aside from the limited work performed by J&M, no progress had been made on any other portion of Horizon's remaining scope of work under the Subcontract since Horizon's default months earlier. SpawGlass directed Horizon and Hanover to submit a recovery schedule and identify a completion subcontractor for the remainder of Horizon's scope of work not being performed by J&M.

On February 16, 2023, Hanover proposed A&M Contractors, Inc. as the other completion subcontractor to complete the remainder of Horizon's scope of work under the Subcontract. Although Hanover had initially offered to contract directly

9

with the completion contractor to perform the remainder of Horizon's work under the Subcontract, Hanover proposed that SpawGlass contract directly with A&M for completion of the portion of Horizon's scope of work not being performed by J&M, and that SpawGlass assume Hanover's Completion Subcontract with J&M. SpawGlass rejected Hanover's proposal as an improper tender of completion, because the proposal did not include the specific scope of work for A&M or J&M or pricing for either.

SpawGlass and Hanover continued to negotiate a reasonable arrangement for completion of the scope of work under the Subcontract, but those negotiations were unsuccessful. According to SpawGlass, "Hanover refused to recognize losses incurred by SpawGlass as a result of both Horizon's and Hanover's own defaults" and "Hanover and J&M not only failed to cure Horizon's defaults, but they also worsened those defaults by themselves failing to make reasonable progress after Hanover undertook to complete Horizon's work under the Subcontract."

Hanover does not dispute that it "offered to takeover and complete all remaining work" under the Subcontract or that SpawGlass refused Hanover's proposed takeover agreement. Hanover instead contends that when it subsequently "offered to tender replacement subcontractors and continued its efforts to cure the alleged default," SpawGlass refused this proposal as well and thus, Hanover was not able to complete performance of Horizon's obligations.

10

**D. Lawsuit**

On April 7, 2023, SpawGlass filed its original petition asserting claims against Hanover and Horizon for breach of the Subcontract and Performance Bond. SpawGlass asserted that its disputes against Horizon and Hanover were subject to binding arbitration, and it requested an order from the trial court compelling the parties to binding arbitration.

Hanover filed a general denial and asserted the affirmative defense of limit of liability, and it incorporated by reference "any and all such defenses and/or offsets asserted by [Horizon] against [SpawGlass]." Horizon, who also filed a general denial, did not assert any affirmative defenses.

After Hanover and Horizon filed their answers, SpawGlass moved to compel arbitration of its disputes against Hanover and Horizon and it sought a stay of the case pending completion of arbitration. SpawGlass argued that pursuant to the mandatory arbitration provision in the Subcontract, its claims against Horizon were subject to arbitration. It further argued that Hanover was bound by the arbitration clause in the Subcontract, and thus its claims against Hanover were subject to arbitration, because (1) the terms of the Subcontract were expressly incorporated into the Performance Bond, including the Subcontract's arbitration clause and its successor clause, (2) Hanover had undertaken "its own efforts" to cure Horizon's default and complete its scope of work under the Subcontract by contracting with

11

J&M directly and it thus was Horizon's successor, and (3) Hanover sought the benefits of the Subcontract "by directly requesting payment to itself from SpawGlass" for J&M's work under the Subcontract.

Horizon and Hanover filed a joint response to SpawGlass's motion to compel in which Horizon conceded it was required to arbitrate its disputes with SpawGlass based on the arbitration clause in the Subcontract. Hanover, however, argued that it was not required to arbitrate with SpawGlass because Hanover was not a party or signatory to the Subcontract, and none of the exceptions allowing a nonsignatory to be bound by an arbitration clause applied.

In reply, SpawGlass argued, among other things, that its claims against Hanover were subject to arbitration because by contracting directly with J&M to complete some of Horizon's scope of work under the Subcontract, Hanover had stepped into Horizon's shoes under the Subcontract and became bound by the same contractual obligations imposed on Horizon, including the duty to arbitrate disputes. SpawGlass also argued that pursuant to the Subcontract, Hanover had submitted a pay application to SpawGlass seeking payment directly to Hanover for work performed by J&M on the Project pursuant to the Subcontract. SpawGlass argued that Hanover did "not deny that it [had] indeed take[n] over performance by HORIZON and sought direct payment for those efforts" from SpawGlass.

After a non-evidentiary hearing on SpawGlass's motion to compel, the trial court signed an order (1) granting SpawGlass's motion to compel arbitration as to Horizon, (2) denying SpawGlass's motion to compel arbitration as to Hanover, and (3) staying the claims against Hanover pending completion of SpawGlass's arbitration with Horizon.

This interlocutory appeal followed.[3]

## Motion to Compel Arbitration

In its sole issue on appeal, SpawGlass argues the trial court abused its discretion by denying its motion to compel arbitration against Hanover because (1) the Subcontract contains a valid and enforceable mandatory arbitration clause that was incorporated by reference into the Performance Bond, (2) Hanover is bound by the Subcontract's arbitration clause, and (3) SpawGlass's claims against Hanover fall within the scope of the arbitration clause. According to SpawGlass, Hanover is bound by the arbitration clause in the Subcontract because (1) the Performance Bond expressly incorporates all of the Subcontract's terms, including its arbitration clause and its successor clause, (2) Hanover stepped into Horizon's shoes as the Subcontractor when it elected to complete Horizon's scope of work under the Subcontract by contracting with J&M and seeking payment from SpawGlass for

---

[3] *See* TEX. CIV. PRAC. & REM. CODE § 171.098(a)(1) (authorizing interlocutory appeal from order "denying an application to compel arbitration made under Section 171.021").

13

J&M's completion work under the Subcontract, and (3) Hanover is estopped from denying it is bound by the Subcontract's arbitration clause because Hanover sought and obtained direct and substantial benefits for itself under the Subcontract.

Hanover responds that SpawGlass's claims against it are not subject to arbitration because (1) the arbitration clause in the Subcontract is "narrow and only applies to SpawGlass and Horizon," and (2) SpawGlass's claims against Hanover do not fall within the scope of the arbitration clause. It further argues that the trial court did not err in staying SpawGlass's claims against Hanover pending arbitration because Hanover's liability (as a surety) to SpawGlass will arise, if at all, only if after completion of the arbitration proceedings between Horizon and SpawGlass, Horizon is found liable to SpawGlass. According to Hanover, if Horizon is found liable to SpawGlass, "Hanover will then have the opportunity to raise its unique surety defenses in the trial court" which are not subject to arbitration.

## A.     Standard of Review

We review a trial court's order denying a motion to compel arbitration for an abuse of discretion. *Wagner v. Apache Corp.*, 627 S.W.3d 277, 283 (Tex. 2021); *Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or acts without reference to guiding rules or principles." *Taylor Morrison of Tex., Inc. v. Skufca*, 650 S.W.3d 660, 676 (Tex. App.—Houston [1st Dist.] Dec. 30, 2021, no pet.) (citing *Downer v.*

14

*Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)). We defer to the trial court's factual determinations if they are supported by the evidence, but we review the court's legal rulings *de novo*. *Henry*, 551 S.W.3d at 115. "A trial court has no discretion in determining what the law is, which law governs, or how to apply the law." *Skufca*, 650 S.W.3d at 676.

## B. Arbitration Clauses

Under the Federal Arbitration Act, which governs the Subcontract's arbitration clause, a party seeking to compel arbitration must establish that (1) a valid and enforceable arbitration agreement exists, and (2) the claims fall within the scope of that agreement. *Wagner*, 627 S.W.3d at 282 (citing *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005)). A trial court's determination regarding the validity and scope of an arbitration agreement is a question of law we review *de novo*. *Henry*, 551 S.W.3d at 115; *see also Valerus Compression Servs., L.P. v. Austin*, 417 S.W.3d 202, 207 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

"The question of whether a valid and enforceable agreement exists includes proving that both parties consented to the agreement." *Trans-Vac Sys., LLC v. Hudson Ins. Co.*, No. 08-22-00232-CV, 2023 WL 4146295, at *4 (Tex. App.—El Paso June 23, 2023, no pet.) (mem. op.) (citing *Aerotek, Inc. v. Boyd*, 624 S.W.3d 199, 204 (Tex. 2021)). "Whether parties have agreed to arbitrate is a gateway matter ordinarily committed to the trial court and controlled by state law governing the

validity, revocability, and enforceability of contracts generally." *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 631 (Tex. 2018) (internal quotations and footnote omitted).  Although the law generally favors arbitration, "it does not create an obligation to arbitrate where none exists" and "a party may not be compelled to arbitrate where it has not consented to do so."  *Trans-Vac Sys., LLC*, 2023 WL 4146295, at *4; *see also Jody James Farms, JV,* 547 S.W.3d at 631("'[A] party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration.'" (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 945 (1995))).  "Who is bound by an arbitration agreement is normally a function of the parties' intent, as expressed in the agreement's terms."  *Jody James Farms, JV,*547 S.W.3d at 633.

Once a moving party proves that a valid arbitration agreement exists, we consider whether the claims fall within the scope of the arbitration agreement.  Any "[d]oubts regarding an agreement's *scope* are resolved in favor of arbitration because there is a presumption favoring agreements to arbitrate under the FAA."  *In re Kellogg Brown & Root*, 166 S.W.3d at 737 (emphasis in original).  The presumption applies only to the determination of scope; it does not apply to the existence of an agreement to arbitrate "or to the identity of the parties who may be bound by the agreement."  *Carr v. Main Carr Dev., LLC*, 337 S.W.3d 489, 496 (Tex. App.—Dallas 2011, pet. denied).

Arbitration agreements are treated like any other contract and are interpreted under traditional contract principles. *In re Olshan Foundation Repair, Co. LLC*, 328 S.W.3d 883, 889 (Tex. 2010). Absent ambiguity, contracts are construed as a matter of law. *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014). In construing a written contract, our primary objective is to ascertain the parties' true intentions as expressed in the language they chose. *Id.* We "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and avoiding unreasonable constructions when possible and proper. *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987). To that end, we consider the entire writing harmonizing and giving effect to all contract provisions so that none will be rendered meaningless. *Moayedi*, 438 S.W.3d at 7. No single provision taken alone is given controlling effect; rather, each provision must be considered in the context of the instrument as a whole. *Id.* We give words their plain, common or generally accepted meaning unless the contract reflects that the parties used words in a technical or different sense. *Id*.

## C. Existence of Valid Arbitration Agreement

Our first question is whether SpawGlass established the existence of a valid arbitration agreement. Generally, an arbitration agreement applies only to parties who have consented to the agreement. In some limited circumstances, however, an obligation to arbitrate may attach to non-signatories to an arbitration agreement. *See*

17

*G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 524 (Tex. 2015) ("We have recognized, however, that in some circumstances a non-signatory can be bound to, or permitted to enforce, an arbitration agreement."); *In re Rubiola*, 334 S.W.3d 220, 224 (Tex. 2011) ("An obligation to arbitrate not only attaches to one who has personally signed the written arbitration agreement but may also bind a non[-]signatory under principles of contract law and agency.").

Texas courts have recognized six theories under which a non-signatory may be bound to, or be permitted to enforce, an arbitration agreement: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel; and (6) third-party beneficiary status. *Lennar Homes of Tex. Land and Constr., Ltd. v. Whiteley*, 672 S.W.3d 367, 376 (Tex. 2023) (citing *In re Kellogg Brown & Root*, 166 S.W.3d at 739). Relying on the doctrines of incorporation by reference and equitable estoppel, SpawGlass argues that Hanover is bound by the Subcontract's arbitration clause because (1) the terms of the Subcontract are expressly incorporated into the Performance Bond, including the Subcontract's arbitration clause and successor clause, (2) Hanover stepped into Horizon's shoes when it elected to complete the Subcontract, and (3) Hanover sought and obtained benefits under the Subcontract by seeking and obtaining payment for itself for J&M's work on the Project.

18

## 1. Incorporation by Reference

Under the doctrine of incorporation by reference, a separate contract or instrument may properly constitute part of another agreement. *See Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968); *In re Raymond James & Assocs., Inc.*, 196 S.W.3d 311, 318-19 (Tex. App.—Houston [1st Dist.] 2006, orig. proceeding); *U-Haul Co. of Tex. v. Toro*, No. 01-22-00883-CV, 2023 WL 8262720, at *9–10 (Tex. App.—Houston [1st Dist.] Nov. 30, 2023, no pet.) (mem. op.). The language in the agreement must refer clearly to the original contract or show that the parties intended for the original contract to become part of the agreement. *See Granite Re Inc. v. Jay Mills Contracting, Inc.*, No. 02- 14-00357-CV, 2015 WL 1869216, at *3-4 (Tex. App.—Fort Worth Apr. 23, 2015, no pet.) (mem. op). Relevant to this appeal, arbitration agreements in a subcontract may be incorporated by reference into a performance bond. *See id.* at *4 (finding that arbitration agreement was incorporated into performance bond, thus binding surety and general contractor to arbitration, and citing cases in support); *see also U.S. Fid. & Guar. Co. v. W. Point Const. Co., Inc.*, 837 F.2d 1507, 1508 (11th Cir. 1988) (holding subcontract's arbitration provisions were incorporated by reference into performance bond).

In *Granite Re Inc. v. Jay Mills Contracting, Inc.*, for example, the Fort Worth Court of Appeals held that a surety's claims against a general contractor were subject to arbitration because the performance bond at issue incorporated the terms of the

subcontract which included an arbitration clause. 2015 WL 1869216, at *4. In that case, Jay Mills Contracting ("JMC"), as general contractor, and North American Marine Industries ("NAMI"), as subcontractor, signed a "Blanket Agreement" under which NAMI agreed to perform work for a construction project. *Id.* at *1. The blanket agreement included an arbitration clause. *Id.* JMC and NAMI separately signed a "Work Order to Blanket Agreement," incorporating the terms of the blanket agreement. The work order required NAMI to "provide bonding for the project." *Id.* Pursuant to the terms of the work order, NAMI executed a separate performance bond with Granite acting as the surety. The performance bond stated that the work order between JMC and NAMI was "incorporated by reference and made a part of this [performance bond] for all purposes." *Id.* Based on this language, the appellate court held that "the performance bond contained a valid arbitration clause applicable to Granite and JMC through the doctrine of incorporation by reference." *Id.* at *4. It did so even though the arbitration clause provided that the "'claimant' in any [] arbitration proceeding could be either 'the Contractor'—JMC—or the [] Subcontractor [NAMI]" and even though the blanket agreement provided that nothing contained in the agreement "shall create a contractual relationship with, or create a cause of action in favor of, a third party which is neither the Contractor [JMC] nor . . .[NAMI]. *Id.* at *1. The court reasoned that Granite's claims against JMC were subject to arbitration because the performance bond had specifically

20

incorporated by reference a contract containing an arbitration clause. *See id.* at \*4 (citing cases holding that "a surety must arbitrate disputes related to a performance bond where the performance bond specifically incorporated by reference a contract containing an arbitration clause").

The Performance Bond here states that the Subcontract between SpawGlass and Horizon "is by reference made a part hereof the same as if it were set out verbatim herein." The arbitration clause in the Subcontract states that if there is "a dispute between Contractor and Subcontractor, Contractor, in its sole option, may elect to arbitrate such dispute in the manner provided below. . ." Hanover does not dispute that the Subcontract, including the arbitration clause, was incorporated by reference verbatim into the Performance Bond or that the arbitration clause is valid and enforceable. Rather, Hanover argues it is not bound by the arbitration clause because by its express terms, the arbitration clause is narrow and applies only to disputes between the Contractor (SpawGlass) and the Subcontractor (Horizon), and Hanover is neither. This argument, however, concerns the *scope* of the arbitration agreement and not the *existence* of a valid arbitration agreement. *See Trans-Vac Sys., LLC*, 2023 WL 4146295, at \*8 (where parties disputed whether arbitration agreement in subcontract had been incorporated by reference into performance bond, and thus whether parties were subject to arbitration, appellate court stated it understood issue "as focusing on the second step in the analysis, i.e., whether the

21

parties intended for their particular dispute to fall within the scope of the arbitration agreement").

Like the court in *Granite*, we conclude that the Performance Bond contains a valid arbitration agreement because under its express terms, the parties incorporated all provisions of the Subcontract into the Performance Bond, including the mandatory arbitration clause. We must still determine, however, whether the claims at issue fall within the scope of the incorporated arbitration agreement. Thus, whether, as Hanover argues, the arbitration clause is narrow precluding its application to the claims at issue, is a separate inquiry we undertake in assessing the scope of the agreement.

### 2. The Successor Clause of the Subcontract

Even if Hanover were correct that the incorporation by reference doctrine does not establish the existence of a valid arbitration agreement, we would still conclude that Hanover is bound by the arbitration agreement because under the facts before us, Hanover assumed Horizon's obligations under the Subcontract. Section 9 of the Subcontract, which also was incorporated by reference into the Performance Bond, states that SpawGlass, Horizon, and their "heirs, executors, administrators, successors, and permitted assigns . . . agree to the full performance of the covenants and agreements herein specified."

SpawGlass argues that Hanover is Horizon's successor under the Subcontract and thus bound by the arbitration agreement, because Hanover assumed Horizon's obligations and rights under the Subcontract when it elected to contract directly with J&M to complete a portion of Horizon's scope of work under the Subcontract. Hanover argues that it is not Horizon's successor under the Subcontract because it was merely performing its obligations as a surety under the Performance Bond, and in any event, it did not complete performance of Horizon's obligations because SpawGlass "refused to accept the terms proposed by Hanover" for completion of the work.

The term "successor," which is not defined by the Subcontract, has many commonly understood meanings. *See Finley Res., Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332, 342 (Tex. 2023); *see also RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (stating unless contract dictates otherwise, "we give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage"). "In its broadest sense, 'successor' means 'anyone who follows,'" but "the term has also been defined as applying to 'one who takes the place that another has left, and sustains the like part or character'—that is, one who has stepped into the shoes of another and assumed the same role or function even without the existence of a formal or legal relationship with the predecessor." *Finley Res., Inc.*, 672 S.W.3d at 342 (internal quotations and

23

footnotes omitted). "Given the range of potential applications, the precise meaning [of the term successor] in a particular contract must largely depend on the use and context in which the term is employed." *Id.* at 342–43; *see also Enchanted Ests. Cmty. Ass'n v. Timberlake Improvement Dist.*, 832 S.W.2d 800, 802–03 (Tex. App.—Houston [1st Dist.] 1992, no writ) ("The exact meaning of the word 'successor' as applied to a contract must depend largely on the kind and character of the contract, its purposes and circumstances, and the context."). The term successor when used in the construction contract context has been defined as a party that assumes both the rights and obligations, or steps into the shoes, of a contracting party. *See Augusta Ct. Co-Owners' Ass'n v. Levin, Roth & Kasner, P.C.*, 971 S.W.2d 119, 123, 126 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (interpreting right of action clause in performance bond which stated "[n]o right of action shall accrue on this bond to or for the use of any person or corporation other than the Owner named herein or the . . . successors of Owner," and holding residents' association was not Owner's "successor" because association, which had been "assigned the right to sue on all claims arising out of the construction contract," had not assumed Owner's obligations under contract).

The successor clause in the Subcontract states that SpawGlass, Horizon, and their "successors . . . agree to the full performance of the covenants and agreements" specified in the agreement. When considering the purpose of the Subcontract and

24

Performance Bond as a whole, and the context of the successor clause included in the Performance Bond and Subcontract, we conclude that Horizon's successor is one who assumes Horizon's rights and obligations under the Subcontract, including its performance obligations. *See Augusta Ct. Co-Owners' Ass'n.*, 971 S.W.2d at 126 (defining successor as party who assumes other's rights and obligations); *see also Finley Res., Inc.*, 672 S.W.3d at 342 (stating "the precise meaning [of the term successor] in a particular contract must largely depend on the use and context in which the term is employed").

Hanover does not qualify as Horizon's successor under the Subcontract merely because it issued performance and payment bonds securing Horizon's performance under the Subcontract. *See Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 418–19 (Tex. 1995) ("Unlike a liability insurance contract, in which the obligation of the insurer to the insured is the primary obligation of indemnity to the insured for loss, the obligation of a surety to a bond obligee is secondary to the obligation owed by its principal."); *see also Penn. Nat. Mut. Cas. Ins. Co. v. City of Pine Bluff*, 354 F.3d 945, 954 (8th Cir. 2004) (stating suretyship status is created through tripartite agreement "whereby one party (the surety) becomes liable for the principal's or obligor's debt or duty to the third party oblige"). Nor did Hanover automatically assume Horizon's rights and obligations under the Subcontract when Horizon defaulted on the Subcontract. *See BDG*

25

*Gotham Residential, LLC v. W. Waterproofing Co., Inc.*, No. 19-CV-6386 (AJN), 2020 WL 6825679, at \*6 (S.D.N.Y. Nov. 20, 2020) ("Courts have consistently held that a surety who elects to assume performance obligations under a surety bond stands in the shoes of the principal and may be liable under the underlying construction contract . . . . These cases do not apply where a surety declines to assume performance obligations and pays the cost of completion or defaults under the bond.").

SpawGlass provided evidence, however, that Hanover undertook to perform Horizon's obligations under the Subcontract when it contracted with J&M to perform completion work under the Subcontract. Under the terms of the Performance Bond, if SpawGlass declares Horizon "to be in default," Hanover has the obligation "promptly [to] remedy the default" or "promptly to (1) "[c]omplete performance of the work in accordance with the terms and conditions of the Subcontract and Contract Documents," or (2) "[o]btain a bid or bids for completion of the Subcontract" and "arrange for a contract between" the lowest bidder and SpawGlass for completion of Horizon's work under the Subcontract. After SpawGlass notified Hanover that Horizon had defaulted on the Subcontract, Hanover sent SpawGlass a proposed takeover agreement. The agreement contemplated that Hanover would contract directly with a completion contractor who Hanover would then pay to cure Horizon's default and complete Horizon's

26

scope of work under the Subcontract.  Although the takeover agreement was never executed, Hanover later signed a Completion Subcontract with J&M under which J&M agreed to complete a portion of Horizon's scope of work under the Subcontract, and Hanover agreed to pay J&M for its work on the Project.  It is undisputed that J&M performed completion work under the Subcontract, and that Hanover submitted a pay application to SpawGlass under the Subcontract for J&M's performance of the work.  Hanover sought payment for itself directly from SpawGlass even though the contractual right to submit pay applications and to receive payment for work performed under the Subcontract belongs exclusively to the Subcontractor.[4]

The terms of the Completion Subcontract, and Hanover's actions pursuant to that agreement, reflect that Hanover chose to complete performance of Horizon's work under the Subcontract, as opposed to assisting SpawGlass in finding a completion subcontractor to complete the work.  By choosing to contract directly with J&M to complete some of Horizon's scope of work under the Subcontract, submitting a pay application to SpawGlass pursuant to the Subcontract, and seeking payment for itself from SpawGlass for J&M's work, Hanover assumed Horizon's

---

[4]  Section 5.2 of the Subcontract, entitled "Applications for Payment," provides that the "*Subcontractor* shall submit applications for payment on the approved form attached hereto as Exhibit B on or before the 20th day of each month." (Emphasis added).  The "Contractor shall pay *Subcontractor* within seven (7) days after Contractor receives payment from Owner." (Emphasis added).

rights and obligations under the Subcontract, including Horizon's obligation to perform the scope of work under the Subcontract and Horizon's right to submit pay applications to SpawGlass for its work under the Subcontract. In other words, Hanover stepped into Horizon's shoes as the Subcontractor. Having done so, Hanover became a successor to Horizon under the Subcontract and thus Hanover is bound by the terms of the Subcontract, including its mandatory arbitration provision.

Hanover does not dispute that it hired J&M to complete a portion of Horizon's scope of work under the Subcontract, that it submitted a pay application to SpawGlass under the Subcontract for the portion of Horizon's work performed by J&M, or that it requested payment directly for itself from SpawGlass for J&M's work, which Horizon was obligated to perform under the Subcontract. Indeed, Hanover does not address its Completion Subcontract with J&M or the pay application Hanover submitted to SpawGlass for payment of J&M's completion work. Hanover instead argues that it could not have stepped into Horizon's shoes or assumed Horizon's rights and obligations under the Subcontract because it never completed performance of the Subcontract and SpawGlass never formally terminated Horizon as the Subcontractor. According to Hanover, although it "offered to takeover and tender completion of the Subcontract[,] SpawGlass *refused* to accept the terms proposed by Hanover" and thus "Hanover did not complete

performance of Horizon's obligations because it was prohibited from doing so by SpawGlass."

The record does not support Hanover's argument. Even though SpawGlass and Hanover never executed the takeover agreement, it is undisputed that after SpawGlass issued its default notices to Horizon and demanded performance from Hanover, Hanover contracted directly with J&M and directed J&M to complete the Remaining Work, which Horizon was contracted initially to perform under the Subcontract. By doing so, Hanover elected to perform Horizon's work and it assumed its obligations under the Subcontract. Hanover does not identify, nor have we found, any authority requiring a general contractor to terminate a defaulting subcontractor or requiring a surety to perform every aspect of a subcontractor's remaining obligations under a subcontract before the surety can be said to have assumed the defaulting subcontractor's rights and obligations under the subcontract. Nor do we agree with Hanover that partial performance under a subcontract is insufficient to subject the partially performing party to the terms of the subcontract. To the contrary, when a surety undertakes to complete its principal's performance, the surety "stands in the shoes" of its principal and it is bound by the same contractual terms to which the principal agreed. *See Beard Family P'ship v. Com. Indem. Ins.*, 116 S.W.3d 839, 845 (Tex. App.—Austin 2003, no pet.); *see also Trans-Vac Sys., LLC*, 2023 WL 4146295, at *6 (recognizing that had surety undertaken to

remedy subcontractor's default by completing its work, surety would have stepped into subcontractor's shoes and been bound "by all of the same contractual obligations" including duty to arbitrate disputes).

We thus conclude that SpawGlass met its burden to establish the existence of a valid arbitration agreement between SpawGlass and Hanover.[5]  We next consider whether SpawGlass's claims against Hanover fall within the scope of the arbitration agreement.

## D.    Scope of Arbitration Agreement

When determining whether a particular claim falls within the scope of an arbitration agreement, courts employ a strong presumption in favor of arbitration. *In re Rubiola*, 334 S.W.3d at 225; *see also In re Kellogg Brown & Root*, 166 S.W.3d at 737 (emphasis in original) (stating "[d]oubts regarding an agreement's *scope* are resolved in favor of arbitration because there is a presumption favoring agreements to arbitrate under the FAA").  The presumption in favor of arbitration "is so compelling that a court should not deny arbitration '*unless it can be said with positive assurance* that an arbitration clause is *not* susceptible of an interpretation which would cover the dispute at issue.'" *Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995) (orig. proceeding) (quoting *Neal v. Hardee's Food*

---

[5]    In light of our finding, we need not address SpawGlass's additional argument that Hanover is subject to the Subcontract's arbitration clause under the doctrine of equitable estoppel.

*Sys., Inc.*, 918 F.2d 34, 37 (5th Cir. 1990)); *see also Henry*, 551 S.W.3d at 115–16 (recognizing presumption favoring arbitration and policy to construe arbitration agreements broadly); *U-Haul Co.*, 2023 WL 8262720, at *14 ("There is a presumption favoring arbitration and a policy to construe arbitration agreements broadly."). "[T]he scope of an arbitration clause that includes all 'disputes,' and not just claims, is very broad and encompasses more than claims 'based solely on rights originating exclusively from the contract.'" *Henry*, 551 S.W.3d at 115–16 (quoting *Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 439 (Tex. 2017); *id.* ("When a forum-selection clause encompasses all disputes arising out of the agreement, instead of claims, its scope is necessarily broader than claims based solely on rights originating exclusively from the contract.") (internal quotations omitted).

To determine whether a claim falls within the scope of an arbitration agreement, we focus on the factual allegations in the plaintiff's petition, rather than the legal causes of action asserted," and we review the terms of the arbitration agreement. *In re Rubiola*, 334 S.W.3d at 225. Claims must be submitted to arbitration if "liability arises solely from the contract or must be determined by reference to it." *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 132 (Tex. 2005); *see also Glassell Producing Co. v. Jared Res., Ltd.*, 422 S.W.3d 68, 77 (Tex. App.— Texarkana 2014, no pet.). "If the facts alleged touch matters, have a significant relationship to, are inextricably enmeshed with, or are factually intertwined with the

31

contract containing the arbitration agreement, then the claim is arbitrable." *Rodriguez v. Tex. Leaguer Brewing Co.*, 586 S.W.3d 423, 432 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); *Cotton Com. USA, Inc. v. Clear Creek Indep. Sch. Dist.*, 387 S.W.3d 99, 108 (Tex. App.—Houston [14th Dist.] 2012, no pet.). In contrast, a "claim is not subject to arbitration only if the facts alleged in support of the claim are completely independent of the contract and the claim could be maintained without reference to the contract." *Glassell Producing Co.*, 422 S.W.3d at 77; *see also Cotton Com. USA, Inc.*, 387 S.W.3d at 108.

SpawGlass argues that its claims against Hanover fall within the scope of the Subcontract's arbitration clause because the Subcontract was incorporated by reference into the Performance Bond, Hanover is Horizon's successor under the Subcontract and thus Hanover qualifies as a "Subcontractor" for purposes of the Subcontract, and there is a sufficient nexus between SpawGlass's dispute with Hanover and the Subcontract. Hanover does not expressly address SpawGlass's argument that its claims against Hanover fall within the scope of the arbitration clause because the dispute between SpawGlass and Hanover touches, has a significant relationship with, or is inextricably enmeshed or factually intertwined with the Subcontract. Hanover instead argues that SpawGlass's breach of contract claim against it falls outside the scope of the arbitration clause because the clause only applies to "a dispute between Contractor and Subcontractor" and Hanover is

32

neither.    According to Hanover, "[n]owhere within the four corners of the Subcontract is [there] an intent by SpawGlass, Horizon, or Hanover, that *Hanover* be compelled to arbitrate with SpawGlass."

We begin our analysis with SpawGlass's factual allegations in its petition. SpawGlass alleges that Horizon was obligated to perform specific work on the Project pursuant to the Subcontract and that Hanover issued payment and performance bonds guaranteeing Horizon's performance under the Subcontract. SpawGlass alleges that Horizon defaulted on the Subcontract by, among other things, failing to comply with the work schedule and not timely paying its vendors and employees.  After Horizon failed to cure its default, SpawGlass placed Horizon "formally in default" and demanded that, pursuant to the Performance Bond, Hanover remedy "Horizon's default and ensure the completion of []Horizon's obligations under the Subcontract by one of the two methods of completion provided by the performance bond itself," the first of which required Hanover to "[c]omplete performance of the work in accordance with the terms and conditions of the Subcontract and Contract Documents."

In December 2022, Hanover submitted to SpawGlass a proposed tender agreement that contemplated Hanover contracting with a single completion contractor who Hanover would "pay to cure the default and complete" Horizon's Subcontract, but no action was taken on the proposal because Hanover did not have

33

a "specific completion contractor identified at that time." The following month, Hanover executed the Completion Subcontract with J&M under which J&M agreed to complete a portion of Horizon's scope of work under the Subcontract.

In February 2023, SpawGlass notified Horizon and Hanover that they were in default, and it pointed out Horizon's and Hanover's alleged continued failure to "provide sufficient manpower and effort on the project and provide a recovery schedule for curing" Horizon's default. SpawGlass claimed that "aside from limited work performed by J&M, no progress had been made on any other portion" of Horizon's work since it had issued its default notices months earlier. SpawGlass requested that Horizon and Hanover "submit a recovery schedule" and further identify a completion contractor for the remainder of Horizon's scope of work not being performed by J&M because neither Horizon nor Hanover "had identified anyone at that point." Later that month, Hanover proposed A&M as the other "completion contractor for the remainder of Horizon's scope of work." According to SpawGlass, Hanover was proposing "a completely different framework for completion" than it had proposed under the December 2022 takeover agreement and Hanover "had been partially performing in the two months since that time." SpawGlass alleged that Hanover initially proposed and undertook to complete Horizon's work itself through contracts between completion contractors and Hanover. According to SpawGlass:

. . . Hanover and J&M, who had been under contract with Defendant Hanover since January 2, 2023, had not only failed to cure the defaults that existed on November 12, 2023, but had further worsened those defaults, by themselves failing to make reasonable progress after Defendant Hanover undertook to complete Defendant Horizon's work.

Thus, SpawGlass alleged that Hanover elected to complete performance of Horizon's work under the Subcontract, and Hanover breached the Performance Bond by failing to complete such performance "in accordance with the terms and conditions of the Subcontract and Contract Documents."

Although SpawGlass asserts a breach of contract claim against Hanover for breach of the Performance Bond, the factual allegations underlying SpawGlass's claim against Hanover have a significant relationship to and are factually intertwined with the Subcontract. *See Rodriguez*, 586 S.W.3d at 432 (stating claim is arbitrable if facts alleged touch matters, have significant relationship to, are inextricably enmeshed with, or are factually intertwined with contract containing the arbitration agreement). Indeed, whether Hanover's performance of Horizon's scope of work is "in accordance with the terms and conditions of the Subcontract" can only be determined by reference to the Subcontract. *See In re Weekley Homes, L.P.*, 180 S.W.3d at 132 (stating claims must be submitted to arbitration if "liability arises solely from the contract [containing the arbitration clause] or must be determined by reference to it"); *see also Glassell Producing Co.*, 422 S.W.3d at 77 (stating "claim is not subject to arbitration only if the facts alleged in support of the claim are

completely independent of the contract [containing the arbitration clause] and the claim could be maintained without reference to the contract").

The plain language of the arbitration clause also indicates that SpawGlass's dispute with Hanover falls within the scope of the clause. Even though the arbitration clause identifies the parties subject to the clause as the Contractor and the Subcontractor, the clause applies broadly to "a dispute between Contractor and Subcontractor." *See Henry*, 551 S.W.3d at 115–16 (stating "the scope of an arbitration clause that includes all 'disputes,' and not just claims, is very broad and encompasses more than claims 'based solely on rights originating exclusively from the contract'"). This language, which does not limit arbitrable disputes to claims arising strictly from the Subcontract, is broad enough to include SpawGlass's dispute with Hanover over Hanover's alleged breach of the Performance Bond based on Hanover's decision to complete Horizon's performance of the Subcontract incorporated by reference into the Performance Bond. *See Prudential Sec. Inc.*, 909 S.W.2d at 899 (stating presumption in favor of arbitration "is so compelling that a court should not deny arbitration 'unless it can be said with positive assurance that an arbitration clause is *not* susceptible of an interpretation which would cover the dispute at issue'").

Hanover's argument that it is not subject to arbitration because it is not the Subcontractor and the parties did not intend for disputes between SpawGlass and

Hanover to fall within the scope of the arbitration clause is unavailing. The inclusion of the successor clause in the Subcontract reflects Horizon's and SpawGlass's intent for their successors to be bound by the terms of the Subcontract and the parties' intent that disputes among them and their successors be subject to arbitration. In the event Horizon defaulted on its obligations under the Subcontract, the Performance Bond gave Hanover the option to "[c]omplete performance of [Horizon's] work in accordance with the terms and conditions of the Subcontract and Contract Documents" or arrange for SpawGlass to hire another subcontractor to complete Horizon's work on the Subcontract. When considered as whole, the Performance Bond and the incorporated Subcontract reflect the parties' intent that Hanover be required to arbitrate its disputes with SpawGlass arising from Horizon's default under the Subcontract and Hanover's corresponding election under the Performance Bond to complete Horizon's performance under the Subcontract. By electing to complete Horizon's scope of work under the Subcontract, hiring J&M to complete a portion of Horizon's work on the Project, and exercising Horizon's contractual right to payment for work performed for the Project, Hanover assumed Horizon's rights and obligations under the Subcontract, including the obligation to arbitrate disputes.

Hanover's reliance on *Ideal Manufacturing* and *Trans-Vac Systems* in support of its argument that SpawGlass's breach of contract claim against Hanover on the

37

Performance Bond does not fall within the scope of the arbitration clause is misplaced. In *Ideal Manufacturing*, Ideal, the subcontractor, sued NGC, the general contractor, and its surety, NASIC, after NGC failed to pay Ideal for materials and services provided for a wind farm construction project. *Ideal Mfg., Inc. v. NGC Group, Inc.*, No. 1:19-CV-164, 2020 WL 826638, at *1 (S.D. Tex. Feb. 4, 2020), R. & R. adopted No. 1:19-CV-00164, 2020 WL 824102 (S.D. Tex. Feb. 19, 2020). In that case, Acciona Energy USA Global, the owner, executed a prime contract with NGC, the general contractor, for construction of the wind farm project. The prime contract contained a mandatory arbitration clause. *See id.* at *1. NGC in turn entered into two subcontracts with Ideal obligating Ideal to provide materials and services to NGC for the project. *See id.* at *3. The Ideal subcontracts both contained arbitration provisions and incorporated by reference the prime contract between Acciona and NGC. *See id.* According to Ideal, the prime contract was incorporated by reference into the performance bond NASIC issued guaranteeing NGC's performance under the prime contract. *See id.* at *6.

Ideal claimed it had not been paid for services provided to NGC under the Ideal subcontracts. It sued NGC and its surety NASIC for breach of contract and it later moved to compel arbitration of its claims against both parties pursuant to the

38

arbitration clauses in the prime contract and Ideal subcontracts.[6]  Ideal argued that even though NASIC was not a signatory to the prime contract and Ideal subcontracts, its claims against NASIC were subject to arbitration based on the doctrines of incorporation by reference and direct benefits estoppel.[7]  *See id.* at *1.  The court concluded that Ideal's claims against NASIC, the surety, were not subject to arbitration because NASIC was not a party to the prime contract or the Ideal subcontracts containing the arbitration clause, and Ideal had not proven that the prime contract had been incorporated by reference into the performance bond NASIC had issued pursuant to the prime contract.  The court further concluded that even if the prime contract had been incorporated by reference into the performance bond, Ideal's claims against NASIC were not within the scope of the arbitration clause because the prime contract did not contain any language "indicating that the parties to the prime contract intended [Ideal's] instant claims against NASIC to be subject to arbitration."  *Id.* at *5.

*Ideal Manufacturing* is inapposite.  Unlike the performance bond in that case, the Performance Bond here incorporated the terms of the Subcontract containing the arbitration clause. Moreover, unlike NASIC, Hanover assumed Horizon's

---

[6]     NGC agreed to arbitrate its disputes with Ideal.  *See Ideal Mfg., Inc. v. NGC Group, Inc.*, No. 1:19-CV-164, 2020 WL 826638, at *1 (S.D. Tex. Feb. 4, 2020), R. & R. adopted No. 1:19-CV-00164, 2020 WL 824102 (S.D. Tex. Feb. 19, 2020).

[7]     Ideal asserted other arguments in support of its motion to compel not relevant for purposes of our analysis.

obligations and rights under the Subcontract by electing to complete Horizon's work under the Subcontract and applying for and receiving payment for J&M's performance of a portion of Horizon's work under the Subcontract. *Ideal Manufacturing* is thus not helpful to our analysis.

Hanover's reliance on *Trans-Vac Systems* is likewise misplaced. Like *Ideal Manufacturing*, the facts in *Trans-Vac Systems* differ from the present case in several material respects. In *Trans-Vac Systems*, the general contractor, Trans-Vac, executed a subcontract with MGB, and the surety, Hudson Insurance Company, issued a performance bond guaranteeing MGB's performance under the subcontract. 2023 WL 4146295, at *1. The performance bond stated that if Trans-Vac declared MGB in default, Hudson could "promptly remedy the default subject to the provisions of paragraph 3 herein," or after reasonable notice to Hudson, Trans-Vac "could arrange for completion of MGB's performance (or Hudson could demand that Trans-Vac complete the performance)." *Id.* If Trans-Vac opted to complete or arrange for completion of MGB's performance, and Trans-Vac complied with its obligations under the bond, Hudson would be obligated to pay Trans-Vac its reasonable costs in completing MGB's work. *Id.* The subcontract stated that disputes between the parties were subject to arbitration. *See id.*

Trans-Vac notified MGB that it was in default under the subcontract, and after MBG failed to take corrective action, Trans-Vac chose to complete the work through

40

a different subcontractor. Trans-Vac did not notify Hudson of MGB's default until two years later, and thus Hudson never had the option of electing to remedy MGB's default by opting to complete its work under the subcontract. *Id*. at *2. When Trans-Vac submitted a claim under the performance bond for its reasonable costs in completing MGB's work, Hudson denied the claim because Trans-Vac had not provided Hudson with timely notice of MGB's default and Trans-Vac "voided the Bond" by failing to give Hudson timely notice. *Id.*

Trans-Vac filed a demand for arbitration against Hudson seeking damages stemming from MGB's default and Hudson's improper denial of its claim under the performance bond. Hudson objected to the arbitration and later filed a declaratory judgment petition in state court seeking a declaration that Trans-Vac's claim against Hudson was time-barred and that its claim against "Hudson's bond" was not arbitrable because "Hudson does not have an arbitration agreement with Trans-Vac." *Id.* at *3. Trans-Vac filed an answer, counterclaimed against Hudson, and moved to compel arbitration arguing Hudson was "bound by the arbitration agreement in the Subcontract due to its incorporation by reference in the Performance Bond." *Id.* The trial court denied Trans-Vac's motion to compel its dispute with Hudson and the court of appeals affirmed the trial court's ruling holding that Trans-Vac's dispute over payment of its reasonable costs for completion of MGB's performance fell outside the scope of the subcontract's arbitration clause because "the only dispute

between the parties centered on Hudson's affirmative defense that Trans-Vac was time-barred from seeking payment from Hudson under the terms of the bond itself." *Id.* at *1.

Unlike in *Trans-Vac Systems*, the dispute between Hanover and SpawGlass does not concern Hanover's attempt to foreclose demand for payment under the Performance Bond based on any affirmative defenses. SpawGlass's claim stems directly from Hanover's election to remedy Horizon's default by opting to complete Horizon's work under the Subcontract. Hanover was not in the dark about Horizon's purported defaults. SpawGlass sent both default notices to Hanover, and unlike Trans-Vac, it demanded that Hanover remedy Horizon's defaults, which Hanover opted to remedy by contracting with J&M and completing a portion of Horizon's scope of work under the Subcontract, thus stepping into Horizon's shoes. Unlike Hanover, Hudson did not step into its principal's shoes by completing its performance under the subcontract. *See id.* at *6. Indeed, Hudson conceded that "had [it] undertaken to remedy MGB's default by completing its work," like Hanover did in this case, Hudson "would have 'stepped into' MGB's shoes for that purpose and been bound by all of the same contractual obligations that were imposed on MGB, including the duty to arbitrate disputes arising from [its] performance in completing the work." We thus conclude that *Trans-Vac Systems* does not support

Hanover's argument that its dispute with SpawGlass does not fall within the scope of the arbitration agreement.

In light of the presumption favoring arbitration and the policy dictating we construe arbitration agreements broadly in favor of arbitration, we conclude that, based on the factual allegations in SpawGlass's petition and the plain language of the arbitration clause, SpawGlass's dispute with Hanover falls within the scope of the arbitration agreement. *See Prudential Sec. Inc.*, 909 S.W.2d at 899 (stating presumption in favor of arbitration "is so compelling that a court should not deny arbitration 'unless it can be said with positive assurance that an arbitration clause is *not* susceptible of an interpretation which would cover the dispute at issue'").

## E. Defense to Enforcement of Arbitration Agreement

If the party seeking arbitration meets its burden to establish the existence of a valid arbitration agreement and that the claims at issue fall within the scope of that agreement, the burden shifts to the party opposing arbitration to establish a valid defense to the agreement's enforcement. *Henry*, 551 S.W.3d at 115; *see G.T. Leach*, 458 S.W.3d at 511. These defenses include waiver, unconscionability, duress, fraudulent inducement, and revocation. *G.T. Leach*, 458 S.W.3d at 511; *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 756 (Tex. 2001). Without evidence supporting such a defense, "the trial court has no discretion but to compel arbitration and stay its own proceedings." *FirstMerit*, 52 S.W.3d at 753–54.

SpawGlass argues that Hanover did not plead any affirmative defenses and thus failed to meet its burden to prove a valid defense to enforcement of the arbitration agreement. The record reflects that the only defense Hanover pleaded was limit of liability, and it incorporated by reference "any and all such defenses and/or offsets asserted by [Horizon] against [SpawGlass]." Horizon, however, did not plead any defenses. Hanover thus did not plead or prove any defenses to enforcement of the arbitration agreement. Consequently, the trial court had no discretion but to compel Hanover to arbitration and stay its proceedings. *See id.* at 753–54.

Hanover argues that it should not be compelled to arbitrate any claims with SpawGlass because Hanover should be given the opportunity to raise unique bond defenses which are not subject to arbitration.[8] But Hanover has not pleaded any "unique bond defenses," and even if Hanover were to raise such a defense in the future, it may not necessarily fall outside the scope of the arbitration clause as Hanover argues.[9] *See Trans-Vac Sys., LLC*, 2023 WL 4146295 at *7, *8 n.10

---

[8] Hanover also argues that it was not required to prove a valid defense to the enforcement of the arbitration clause because SpawGlass did not meet its burden to prove that a valid and enforceable arbitration agreement exists and that its dispute with Hanover falls within the scope of the arbitration agreement. Hanover's argument is not persuasive because, as we have already concluded, SpawGlass met its burden of proof.

[9] Hanover has not raised any affirmatives defenses and we express no opinion whether Hanover may raise a unique bond defense in the future or whether such a defense may fall within the scope of the Subcontract's arbitration clause.

(recognizing surety's "unique bond defenses" can fall within scope of arbitration clause and listing cases holding surety's defenses under performance bond were subject to arbitration clause included in contract incorporated by reference into performance bond).[10]  Furthermore, even assuming Hanover asserts a unique bond defense in the future that is not arbitrable, the prospect of a bifurcated proceeding in which Hanover must arbitrate some defenses and litigate others does not justify the denial of a motion to compel arbitration.  *See Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 215–18 (1985) (stating that under FAA, federal district courts must "compel arbitration of pendent arbitrable claims" when motion to compel arbitration is made and parties have agreed to arbitrate their dispute, "even where result would be possibly inefficient maintenance of separate proceedings in different forums").

---

[10]  *See also Suretec Ins. Co. v. C.R. Crawford Constr., LLC*, No. 6:21-CV-00398-JDK, 2021 WL 6280376, at \*8 (E.D. Tex. Dec. 15, 2021) (holding where construction contract contained arbitration agreement subjecting "[a]ny Claim arising out of or related to the Contract" to arbitration, which was incorporated by reference into surety's performance bond, parties' disputes, which included surety's defenses under performance bond and disputes regarding whether principal under bond adequately performed its obligations under construction contract, fell within scope of agreement); *Granite Re Inc. v. Jay Mills Contracting Inc.*, No. 02-14-00357-CV, 2015 WL 1869216, at \*4–5 (Tex. App.—Fort Worth Apr. 23, 2015, no pet.) (mem. op.) (holding that where arbitration agreement in construction contract providing that "all claims, disputes and controversies arising out of or relating to [the contract] shall be decided by arbitration" was incorporated by reference into surety performance bond, dispute between contractor and surety arising under bond fell within scope of agreement) (citing *Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998)).

Because SpawGlass established the existence of a valid arbitration agreement and showed that its dispute with Hanover falls within the scope of that agreement, and Hanover did not prove a defense to enforcement of the arbitration agreement, the trial court did not have the discretion to refuse to compel arbitration of SpawGlass's claims against Hanover. *See FirstMerit*, 52 S.W.3d at 753–54. We thus conclude that the trial court abused its discretion by denying SpawGlass's motion to compel arbitration.

We sustain SpawGlass's sole issue.[11]

## Conclusion

We reverse the trial court's order denying SpawGlass's motion to compel arbitration and we remand the matter to the trial court for entry of an order compelling arbitration of SpawGlass's claims against Hanover.

Veronica Rivas-Molloy
Justice

---

[11] This opinion should not be misconstrued as holding that all sureties are bound by arbitration clauses included in a subcontract that is incorporated by reference into a performance bond. Rather, our conclusion that Hanover is bound by the arbitration clause in the Subcontract, which it agreed to incorporate by reference into the Performance Bond, is based on the unique facts of this case, including the terms of the Subcontract, the Performance Bond, and the Completion Subcontract, and Hanover's election to complete the "performance" of Horizon's scope of work "in accordance with the terms and conditions of the Subcontract."

Panel consists of Justices Hightower, Rivas-Molloy, and Farris.